## AUDITORIUM VENTILATING CORPORATION v. GREATER ROCHESTER PROPERTIES, INC.

District Court, W. D. New York.
July 31, 1929.

On Rehearing Sept. 23, 1930.

Charles W. Parker, of Buffalo, New York (Clifford E. Dunn, Drury Cooper, and Charles J. Staples, all of New York City, of counsel), for plaintiff.

Fish, Richardson & Neave, of New York City, and Bartholomew & Bartholomew, of Buffalo, N. Y. (Charles Neave and Clarence D. Kerr, both of New York City, and Parker Dodge, of Washington, D. C., of counsel), for defendant.

On Rehearing:

Duell, Dunn & Anderson, of New York City (Drury W. Cooper, Clifford E. Dunn, and Charles J. Staples, all of New York City, and Charles W. Parker, of Buffalo, N. Y., of counsel), for plaintiff.

Bartholomew & Bartholomew, of Buffalo, N. Y. (Charles Neave and Clarence D. Kerr, both of New York City, and Parker Dodge, of Washington, D. C., of counsel), for defendant.

HAZEL, District Judge.

In this suit in equity we are concerned with the asserted infringement by defendant of two United States letters patent owned by plaintiff; the first (16,611) granted to Leo L. Lewis by reissue on May 3, 1927, for method and apparatus for cooling and ventilating, and the second (1,670,656) for a ventilating system to Walter L. Fleisher, granted May 22, 1928. Both these patents were assigned to plaintiff in December, 1927. The typical claims of the Lewis patent, to which I shall make further reference, are 13 and 14 (though 8, 10, 13, 14, and 17 are also involved), and of the Fleisher claims 1 and 20, including process and system (though 1, 3, and 5 are also involved). The defenses, in the main, are noninfringement, restriction of claims, prior use, and anticipation.

The patents have particularly to do with supplying humidified air to auditoriums, theaters, schools, and other large buildings for ventilating purposes, and especially to eliminate such problems and difficulties to successful ventilation as generally present themselves to congregations of persons in the summer months, or where a relatively high humidity prevails, say greater than 50 per cent., causing discomfort, and problems relating to refrigeration or supplying continuous humidified air, taking out vitiated air and replacing it by new or revivified air and maintaining a relatively low humidity, together with a suitable apparatus for attaining the results. The objects and purposes of both patentees were to secure proper temperature and a proper degree of moisture in theaters, regardless of hot or cooler weather or climatic changes, or the number of patrons, few or many, within the theater or assembly room, who emit body moisture and proportional quantity of heat. The desirability of proper ventilation and uniform humidity within amusement places by frequent change of air, and reuse of respired air in lieu of all fresh air (in some instances as many as 12 times per hour) is claimed to have had its impetus in the expansion and development of moving picture houses, which not infrequently accommodate as many as 300 to 6,000 persons.

Ventilating systems generally, or systems for conditioning air in a building, that

is, by heating and artificial cooling, passing it over or around the conditioner, controlling the temperature by thermostat and thus humidifying the air, or adding moisture and removing moisture, all regulated by control instrumentalities, were well known in the art prior to the patents in issue; and, indeed, there were cooling and heating methods in use at theaters, which, however, did not attain good results, in that insufficient air for cooling was provided in some instances, and in others the air was either cooled too much or the moisture was not sufficiently dried out. It was also old to regulate and control the relative humidity or the so-called dew point, or control the temperature in washer spaces or chambers (Buffalo Forge Co. v. City of Buffalo [C. C. A.] 255 F. 83), and to circulate return air, tempering or mixing it with conditioned fresh air under regulation in drying rooms of factories, while temperature was lowered at will or maintained constant by suitable devices.

Plaintiff claims that the atmospheric conditions in these earlier structures used in industry and the cooling of theaters were fixed and certain without any interfering or retarding alternations in the air, such as ordinarily result from mugginess or dampness or changes in the audience of a theater (groups coming in and going out during the performance), or from emanating, normal body heat and moisture. To give proper purification of the interior air by use of the Lewis reissue and Fleisher methods, outdoor air was constantly needed for admixture with the air in the theater. The evidence shows that 25 per cent. of the total quantity of air in a modern theater or moving picture house is continuously introduced from outside the building, and, by the processes in suit, controlled proportionately and correspondingly to the fluctuations constantly arising from variable conditions. It was air of uniform distribution and character, to eliminate dampness and discomfort in playhouses, that chiefly concerned the inventors. It was important to get rid of the heat and moisture given off by the audience, estimated at 400 British thermal units of heat, which, added to the exudation of moisture and heat from electric lights, leaks from walls and roofs, especially in the summer months, interfered with wholesome temperature. Better and proper ventilation was the object of the patentees. By the use of their processes and apparatus, the heating plant need not be used in summer and the interior warm air utilized. Or, on the other hand, the air

taken from the interior may, if desired, be reheated to a proper temperature. To revivify the air conditions of the interior of a theater, as specified in both patents in suit, was a new and novel conception. The alternate variations of heat and moisture, to eliminate dampness and chilliness, necessitated the introduction of a certain amount of fresh air to attain efficient cooling and ventilation regardless of outside or inside conditions. This was not an easy task. Lewis' problem was to originate means for compensating for these varying conditions extant in large, modern theaters, and securing continuous pure and comfortable air conditions at minimum expense of installation and maintenance. He accomplished his object by automatically conditioning, mixing, and heating the fresh air with air drawn through conduits from the inside of the theater, and then returning it to the theater for ventilation.

Although means for ventilating theaters, by passing the air through an apparatus for removal of moisture, were in use at the date of the Lewis reissue, as before stated, yet such prior adaptations were inefficient and expensive, since the cold air required hot air or steam for reheating before the air was let into the theater or room. Approximately 108,000 cubic feet of air per minute is ordinarily used in theater ventilation, and manifestly would entail an expense for cooling and an expense for reheating the air during different seasons of the year. In prior devices, the record shows, the temperature of the air was lowered by washing or spraying, which was objectionable, because it raised the humidity and left the air damp and unevenly distributed. No equable temperature or correct humidity was obtainable since no means were provided for compensating changes in alternate air, resulting from interior variability. In plaintiff's adaptations, the bulk of the air, taken from the theater, is recirculated or reused without first conditioning it. It is important to note that Fleisher utilizes three kinds of air, namely, fresh air from outdoors, return air from the theater, proper for humidifying or dehumidifying by the conditioner, and air from the theater for reuse without conditioning, known as recirculated air, which, in both patents in suit, is used to mingle with saturated fresh air, or with return air, and comes from the conditioner as a new air. The recirculated air is of higher temperature than the conditioned air. It passes to the mixing chamber for uniting with the conditioned air before dis-

cnarge through pipes or ducts at the openings in the theater, and its larger volume increases the temperature of the conditioned air, and also imparts a lower relative humidity to the mixed air. The conditioner is an attached equipment for spraying, heating coils, fan, etc., for reducing the air in the summer to a desired dew point, and reducing temperature of the sprayed water by refrigeration—in short, it is an aid in humidification, raising temperature, and reducing relative humidity.

There are mushroom outlets, shown in the Lewis patent, located under the seats in the theater, from which the inside air is drawn through a plenum space to the suction fan. There is another fan which draws air, from the conditioner and delivers it through a series of pipes to the balcony and the lower parts of the theater; while a hygrostat, placed in a duct leading from the theater, responds to changing conditions both as to temperature and humidity within the theater and causes dampers A, B, and C respectively (see lower diagram Exhibit 8) to draw air to the conditioner for cold air supply, and to allow air to escape equal to the amount admitted so as to restrict the amount of circulation, and also opens widely the recirculating damper allowing a higher temperature, if desired, to pass to the conditioner.

Defendant challenges the utility and operativeness of the Lewis reissue, but the system and apparatus is shown to have been in use, and, though changes in temperature control were made, still I find that the essential features of operation and control were retained and enable successful operation. Concededly the apparatus may be located in the basement or elsewhere in the building.

The Fleisher patent, which has gone into extensive use, is an expansion of the Lewis generic adaptation, differing from it, in that a pipe passes the current of air directly to the conditioner for tempering, while its return is controlled by damper C (Exhibit 7). By this modification the air in the theater quickly responds to the variations registered on the thermostat. Lewis conditioned all fresh air, while in the Fleisher patent the returned part of the air may be cooled by the conditioner and recirculated, thus eliminating the use of steam coils in the summer for reheating the cooled air. The beneficial use of air from the theater for recirculation beyond the conditioner without uniting it with conditioned outside air was Fleisher's accomplishment. He attained it by propor-

tioning the volume of return air so that the amount of recirculated air beyond the conditioner and the volume of return air passing through the conditioner would vary, and making both responsive to alternating conditions in the theater. In addition, he also arranged to have the return air pass directly to the conditioner by means of fan suction and by damper control of openings admitting desired amounts of air to pass from beyond the conditioner, and an equal amount of return air through the conditioner. In other words, as stated in plaintiff's brief, he designed that, the "larger the volume of return air recirculated beyond the conditioner, the less the volume of return air going through the conditioner and vice versa." His central idea apparently was to mingle the return air passing to the conditioner with a small amount of fresh unconditioned air, preparatory for ventilation, thus avoiding conditioning a large amount of fresh air. The gist of his invention constituted a steady reuse of the air piped from the theater, thus lessening the expense in apparatus construction and maintenance. This object and purpose is supported by the proofs. The Lewis specification points out that, to maintain the proper distribution of suitable air throughout the inclosure, too great a difference in temperatures between the incoming air and the air in the room itself must be avoided; and that proper humidity is secured by diluting the intensively conditioned air proportionately from the standard to be maintained. The Fleisher adaptation, I think, was a progressive advance over the Lewis reissue.

The exhibit drawing (Fig. 7) shows a fresh air duct for passing air through the conditioner by a fan, a hand damper for restricting the flow, the return duct for fanning the air from the theater to the intake side of the conditioner and the course for bypassing, while the fan impelled the air from the conditioner to discharge it from the mixing chamber to the room. A wet and dry thermostat is placed in the return passage to gauge the varying conditions in the theater. Lewis's use of hygrostat was to regulate and control the dampers in air recirculation, but either by hygrostat or thermostat conditions in the theater are reflected. These means for control and regulation were essential to the achievements of favorable results in both inventions. In Fleisher's patent the wet bulb thermostat controls the spray of water in the summer, but in winter a preheater for warming fresh air and

to absorb moisture is used; while the dry thermostat is used to control the reheater in the recirculating duct to supply or reduce the steam heat. Damper D decreases the amount of return air by-passing the conditioner, thus contracting the recirculating duct to proportionately enhance the amount of return air at the intake side of the conditioner, and also increases the amount of outside air. This is done to draw the return and fresh air through the conditioner to secure dew point reduction for refrigeration, and for combining both in the mixing chamber before it is supplied to the theater. The cold air goes through the conditioner by constricting the damper in the return duct, the warm air upon opening it, and in this manner allowing more air to by-pass the conditioner. The damper D, by the described arrangement, is made responsive to alternating conditions in the room; that is to say, it controls the quantity of recirculated air, including the returned and fresh air for reconditioning.

Defendant claims that the principle of operation under both patents in suit is old. Prior use in the Central Park Theatre, the Hennepin Orpheum Theatre, the earlier patents to Klein, Carrier, and to Lissauer & Keyes is strongly emphasized as anticipatory or of such importance as to warrant a strict limitation of the claims. The Central Park installation shows that a portion of the fresh air and a portion of return air by-passed around the conditioner. The revamped system of 1919, like its predecessor, was intended to cool the theater in summer months. Cooling coils located in the bottom of the old fresh air shaft were provided with sprays for saturation and for cooling the air coming down the shaft. After passing over the sprays, the air was discharged into the theater by a fan through ducts leading to separate so-called mushroom ventilators located in the orchestra and balcony. The air in the theater was drawn out through dampers in the ceiling or through doors in the shaft for conditioning or recirculation without conditioning through grills in the rear wall of the orchestra. In part the air was from outside and part unconditioned from the theater. By this method it was designed to eliminate drafts from grills back of the orchestra, but it did not succeed in doing so. Further changes were made, consisting of using duct C (Exhibit 16) into the intake side of the fan at E, so as to draw air from the theater instead of passing it through grills into the theater back of the orchestra. The supply duct was closed, the air drawn from duct C, and a so-called riser H was connected thereto. Riser F was closed. But, as the air thus transmitted to the intake side of the washer was not conditioned air, it is doubtful whether a constant uniform temperature was attained by the alterations. However, as the recirculated air entering the shaft through the doors, either from outside or inside the theater, did not pass the conditioner, the unconditioned air from inside the theater, I find, was incapable of achieving the result of the inventions in suit. The conditioned air in the Central Park structure, drawn through a duct, amounting to approximately 4,000 cubic feet, or about 8 per cent. of a total volume of, say, 49,000 cubic feet of air within the theater, would not appreciably affect the temperature for reheating or control the relative humidity. It would be a negligible quantity. In opposition to this view, defendant claims that the air entering the theater is increased in quantity upon partially closing dampers at the top of the air shaft, thus lessening the amount of descending air, with the result that, together with air from other sources for supplying the fans, it is drawn through the by-pass duct in enlarged quantities. The doors opening to the lobby, however, were not designed for recirculation purposes, as Mr. Waterman testified, and the air entering the open doors is in the main drawn from the foyers and passed through the conditioner into a fan for distribution as returned air and not recirculated air within the meaning of the patents. The installation was incapable of accomplishing the Lewis basic process. Nor was it designed for regulation of proportions of returned and conditioned air—the essential feature of Fleisher. It is not deemed anticipatory of either patent in issue.

Scholte, it is true, swore the changes made by him in the original system show the conversion of the supply grills into exhaust grills by which more recirculated air was obtained, and decrease of conditioning without spraying to reduce relative humidity from the conditioner, thereby obtaining a suitable temperature. An analysis of his testimony, however, in connection with the details of the structure, does not convince me that his alterations were capable of achieving the results of plaintiff's patents.

The Hennepin Orpheum Theatre system (completed in June, 1922), is of the upward ventilating and cooling type of apparatus. It is provided with an air conditioner for the orchestra and another for the balcony. The air entering the upper and lower floors

of the theater is withdrawn at the ceiling. It was designed, defendant claims, for recirculating respired air up to 50 per cent. of the total volume. The air was drawn from the bottom of the shaft, by-passed around the cooling coils and washers or for reheating and mixing for raising temperature, and then emitted inside the theater. Plaintiff contends that the system is not responsive to the claims in suit; that, in fact, it does not show a recirculation of return air. The proofs show that in operation the air passes from the duct through an improvised hole in the partition of the apparatus to the conditioner, and from thence is by-passed to the fan and driven into the theater; that there were no means for automatically controlling the amount of air passing through the hole opening; that an insufficient quantity was admissible for combining the needed fresh air and return air for passing around the conditioner for humidifying, and finally was designed for recirculation to the orchestra only. Since no means are contained in the structure for separating recirculated, fresh, and return air, I think it was impossible to successfully vary the air conditions within the theater, or achieve the beneficial results of either patent in suit.

The Peters-Hungerford patent, No. 843,-909, describes means for regulating temperature, humidity, and ventilation of inclosures in which people congregate, including theaters. It has an air cooler and air heater, fan, ducts, valves, and steam outlet to condition the air, a series of dampers, thermostats, and humidiostats to control the air passes for maintaining a constant flow of fresh air associated with the air that has passed through the room—a reuse of the same body of air, or a substantial part thereof. The patentees aimed to maintain, as far as possible, a constant condition of air circulation with relation to its temperature and humidity. The expert witnesses did not agree as to the operativeness of the devices for theater ventilation, and especially as to the function of the dampers controlling certain valves and air passes to achieve the desired result. The function of the damper regulating the passage of air to the cooler was brought about by air pressure actuating it, and, upon opening, air passed through the cooler which, according to expert Waterman, caused the damper to operate from one extreme to the other, instead of progressively to assume partly open positions. Mr. Harbula, however, testified that it was not necessary to have the dampers fully closed; that air could be passed through the cooler (18) and at the same time through the by-pass (26), provided the thermostat (35) and humidiostat (37) were of the graduated type, and that this also applied to air heater (20) and by-pass (27). Mr. Waterman, in analyzing the function of the dampers, thought that they were intended to operate with a series of valves in open or shut position, which, if the dampers were open, would pass all the fanned air through the cooler, instead of by-passing portions of it. Thus operated, the air doubtless would have been cooled and humidified, but, since it was designed to leave the cooler air in a saturated condition without division of the outdoor and returned air, the mingling of recirculated air with conditioned air, as in plaintiff's patents, was absent. I find no means for recirculating air, nor for proportioning conditioned and return air, and though, in some respects, it was an approach to plaintiff's system of air ventilation, it does not call for a limitation of the claims of either patent. Even though it could be modified to accomplish the function of plaintiff's so-called Carrier system, or the system described in the two patents under litigation, since its object was not the same, and by its use the same result could not be attained, it is not anticipatory. Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658.

Neither the Crane & Hodge patent nor the Braemer patent, both covering humidifying apparatus, discloses or suggests the utilization of the larger portion of air from the room for purposes of recirculation, while the Klein patent, though drawing air from the room and mixing it with hot air before again entering the room, lacks the central idea of the patents of supplying a different kind of air, or treating it to respond to changing conditions of either the weather or number of persons in the room. None of the prior art patents or prior uses disclose the variation in proportioning of air volumes and proper distribution for desired recirculation and proper temperature and ventilation in theaters, and hence are not anticipatory. Neither the American Bosch asserted prior use, the Springfield Y. M. C. A. use, nor the New York State Commission publication disclose the recirculation of air feature in connection with refrigeration for reheating air, reduction of humidity, or proportioning of air to meet variable conditions in the room from which air is taken for recirculation.

Lewis was not only the first to use a

system of recirculation of a large quantity of air, drawn from inside the theater, and to control both temperature and humidity, but he also was the first to condition only a relatively small part of the air so circulated as to secure desired ventilation and humidity; while Fleisher, as heretofore explained, conceived a betterment by using a minimum of outside air mingled with a larger portion from the interior of the theater, and proportioning the return air from the theater to allow the quantity recirculated beyond the conditioner to respond to interior fluctuations. Both patents were new and novel and advanced known cooling and ventilating systems of the type under consideration.

The infringement of plaintiff's system by defendant is strongly challenged. To establish infringement, concededly the burden of proof rests upon plaintiff, and, after considering as carefully as possible the claim of noninfringement, and having in mind a reasonable breadth of the claims in issue to which I deem them entitled, I have concluded that the weight of the evidence upon the question of infringement is in favor of plaintiff. Method claim 13 and apparatus claim 14 of the Lewis reissue, and method claim 1 and apparatus claim 20 of the Fleisher patent, may be fairly taken as typical of the others in issue. They read as follows:

"13. The method of ventilating and providing desired atmospheric conditions in an enclosure in which people assemble, which includes conditioning fresh outside air to provide air having a dew point below the dew point of the air in the enclosure, mixing air withdrawn from the enclosure with said outside air after the latter is conditioned, introducing into the enclosure the mixed outside and withdrawn air, and permitting the relief from the enclosure of volumes of the air thereof substantially corresponding with the volumes of outside air which are conditioned and introduced into the enclosure.

"14. In an apparatus for ventilating and providing desired atmospheric conditions in an enclosure in which people assemble, the combination with said enclosure of means for permitting relief of air therefrom in restricted quantities, an air dehumidifier having an inlet for outside fresh air, a mixing chamber in communication with the outlet of said dehumidifier, means between said mixing chamber and the enclosure for causing fresh air to be drawn through the dehumidifier and mixing chamber and insuring the delivery thereof into the enclosure and also for returning air from the enclosure to said mixing chamber wherein it is mixed with the dehumified air passing therethrough, and means for varying the admission of fresh air to said dehumidifier."

(Fleisher) "1. The process of ventilating and conditioning a room, which includes withdrawing air from the room, mixing fresh air with withdrawn air, conditioning said mixture, adding withdrawn air having a condition different from the conditioned air to said mixture after conditioning and adjusting responsive to air conditions in the room the proportions of conditioned air and withdrawn air to vary the humidity in the room."

"20. In a ventilating system a conditioning device, an enclosure to be ventilated, means automatically controlled for delivering a portion of the air from the enclosure to the device for conditioning and by-passing another portion around the device, the by-passed air and air from the conditioner being arranged to mix, and means for delivering the mixture to the enclosure in a condition determined by the condition of the air coming from the enclosure."

Defendant's system like plaintiff's, is directed to cooling and ventilating theaters or auditoriums. In its operation it utilizes air ducts and return air ducts for fanning air to the interior of the theater and bringing air back from the theater to the conditioning chamber together with an outside fresh air duct functioning to open and close suitable dampers. In operation during the summer months, it continuously draws air from the enclosure for recirculation through damper D, which draws an amount of air equal to the amount of fresh air taken in and let out to the atmosphere. It is shown that nearly 27,000 cubic feet of air per minute passes to the conditioner, fans dispose of 108,000 cubic feet, while the remaining amount, after mixing with fresh air equaling in quantity the relieved air, flows through the recirculating duct. Lewis states in his specification that the major portion of the air, not less than 75 per cent., withdrawn from the theater is recirculated and returned; the balance being passed outside the building. There is a diversity of opinion expressed by the witnesses relating to the amount of return air passing through the conditioner of the Lewis reissue; defendant contending that the return air passes without treatment back into the theater; that the greater part of the recirculated air passed through a dehumidifier, by-passing a part around it, while defendant recirculates

more than 50 per cent. of the return air through the conditioner, and accordingly its system is not an infringement. The Lewis reissue, however, does not specify that the greater quantity of air for recirculation passes through a dehumidifier. The evidence, establishes a by-passing of most of the return air around the dehumidifier or conditioner for controlling the temperature and humidity. This was a new and novel conception. In both Lewis and defendant's systems, as pointed out above, unrelieved air comes from the interior of the theater, and, after mixing it with fresh air, it becomes recirculated air. To pass the return air around the conditioner was for the purpose of recirculation and, not unlike Lewis's, the recirculated air constitutes the total return air minus the amount relieved. The fresh air entering the conditioner, in defendant's system, tended to lower the dew point below the withdrawn air. In both instances the return air was dehumidified and cooled for use in summer by fanning through ducts before mixing and discharging it into the theater.

In arranging the damper C to connect with damper D, as shown in the exhibit drawing of defendant's structure, infringement was not avoided, for a disconnection of damper C and stoppage of the discharge nevertheless, in my opinion, enables operation in substantial accord with the Lewis system. Nor does the addition of Fleisher's adaptation exonerate defendant. Defendant's arrangement of the hand-controlled damper D controlling 60 per cent. of the space in the air duct and connected with another damper to restrict the air functions substantially in the same way as the Lewis patent whenever groups of people increase in the theater, since, in such case, the fresh air taken in correspondingly increases in volume. The air is quickly withdrawn from the inclosure in both systems, which is instantly evidenced in the plenum chamber, and thermostat A, in defendant's structure, is thereby influenced because of its location in the return duct. The result of responsiveness to interior air conditions is similar to the operation of the hygrostat and the dry bulb thermostat of plaintiff's patents.

Defendant's use of a small, manually-controlled damper functions, I find, with dampers C and D and fresh air damper precisely as does the automatically-controlled fresh air damper of Lewis. The thermostat co-operates with connecting dampers and increases or cuts off the amount of air by-passing the conditioner, and also serves to admit more return air to it. The revolving fans likewise operated in the same way as plaintiff's and accomplished the same object. By the addition to the Lewis reissue combinations of means for adjusting the proportions of previously conditioned and withdrawn air for varying the humidity, infringement of the basic patent is not avoided. It is shown that defendant by its addition of means for adjusting proportions of air for conditioning and withdrawal, achieves, to a substantial degree, the same result as Fleisher, namely, an automatic temperature control for proportioning the return air by damper C which controls a part of the air from the inclosure to the conditioner and by damper D which enables by-passing air from the duct extending from the theater and mingling in the mixing chamber with other air contained therein. The thermostat as before stated, is responsive to changing air volume, and is adjustable for regulating desired quantities of fresh and withdrawn air to the conditioner, together with recirculated air around the conditioner for admixture and ensuing discharge. Much has been said in argument regarding defendant's failure to use proportions of fresh air increase with varying changes in the theater; and the testimony of witness Seid on this point is criticized. But, since Seid observed defendant's system on two occasions in operation under summer conditions, and particularly noted the dampers C and D changed in position, it is fairly evident that the dampers operated progressively and in substantially the same way as in the so-called Carrier system.

Failure to use the Lewis and Fleisher inventions continuously, or either invention, does not afford relief from responsibility, for an apparatus, as ruled in Wright Co. v. Curtiss Co. (D. C.) 204 F. 597, affirmed (C. C. A.) 211 F. 654, 657, which infringes part of the time only, though capable of infringement as occasions require, is no defense to infringement. Shelby Steel Tube Co. v. Delaware Seamless Tube Co. (C. C.) 151 F. 64, affirmed (C. C. A.) 160 F. 928. Nor is impairment of a function, or even a mere mechanical improvement or new co-ordination of parts without achieving a new result, an excuse for appropriation of a prior invention covering the same idea of means. Whatever changes have been made in defendant's adaptation are simply colorable without any new principle of operation. That defendant's system is responsive to the various claims in issue, and has taken plaintiff's recirculation feature without material alteration, prepond-

eratingly shows by the evidence of the witness Seid and expert Waterman. Defendant's heaters, placed on one side of a duct, its denial of reaching a dew point save by hand control, and its damper arrangement in the fresh air duct or differentiation in its controls are neither important improvements nor impairments of plaintiff's origination. The claims in controversy are not specifically limited to details of operation. Syracuse Chilled Plow Co. v. Leroy Plow Co. (D. C.) 233 F. 682; Parsons Non-Skid Co. v. Atlas Chain Co. (C. C. A.) 198 F. 399. The assertion of defendant, based on the testimony of the witness Harbula, that defendant's means and apparatus were a new departure is not substantiated. It appears that plaintiff's engineer made disclosure of the patented systems to defendant which at first had planned a system without embodying the recirculation of air from inside the theater. Later it installed such features without license from plaintiff.

■ Both the Lewis reissue and Fleisher patents in suit are valid and infringed by defendant, and this conclusion may fairly, I think, be reached without the necessity of according to the claims sued upon a scope of such latitude as to include all means for the recirculation of air within the inclosure, or proportioning air, or air withdrawn from the interior of the theater, since a limited application of the doctrine of equivalents affords plaintiff protection for the discoveries. A decree with costs may be entered.

### On Rehearing.

The Ashland, Ohio, installation at the Reliable Match plant, which is the subject of the rehearing pursuant to stipulation between the parties, was originally (in 1922) a method of drying matches by using steam coils, ducts, and fans in cold weather, to which was later added, for summer use, an air washer or conditioner with automatic controls or dampers wherein the air was cooled by washing. There was provided a duct for admitting outside air and return air, or a combination of both, and, after heating, the air was distributed by a fan to rooms of the factory to relieve 175 pounds of atmospheric moisture per hour to which the matches were extremely sensitive, since the moisture or dew made drying them difficult after their various dippings in a phosphorus solution. It was a problem to effect dessication after the dipping operations in summer, especially in humid periods. In adapting the system, an average uniform temperature of approximately 70 degrees, it is claimed, was maintained by resorting to automatic by-

passing of the air returned from the room and passing it around the conditioner to maintain uniform conditions in the match-making room. Prior to the installation the moisture from the summer heat and the heat from motors operating the machines, and the heat and moisture from workmen, not infrequently made it necessary to shut down the plant, since making matches under such conditions was wholly impossible; while afterwards, following the installation of the air washer system, the plant was enabled to operate continuously throughout the year. And it is asserted that said prior structure is similar in its essentials to that used by the defendant, and, moreover, was anticipatory of both patents in suit.

Plaintiff, in opposition, insists that said system in its construction was essentially different from defendant's diagrams KK, and in fact was incapable of operating or performing the functions of either patent in suit. A large number of depositions (21 witnesses in all) were taken on both sides before a notary public to support the respective contentions.

Before discussing the asserted prior use structure, further reference to the patents in suit will, perhaps, not be amiss. They were primarily directed to relieving theater auditoriums and rooms from relative humidity and heat prevalent in summer and augmented by the presence of a large number of persons and changing groups coming into and going out of the theater, and to producing comfortable conditions for them while in attendance. In doing so the patentees had in mind materially reducing the cost of installation of prior ventilating systems and decreasing expense of reheating and refrigeration. It was a system whereby air from the interior of the theater (50 per cent. of the total air used) was continuously recirculated after mixture with conditioned air; the object being to recirculate the total air to speedily absorb the heat and moisture in the room. The Lewis conception was to condition fresh air, brought in from outside the theater by suitable openings, with air drawn from the theater; while Fleisher's invention consisted of suitable proportioning the quantity of external air together with a larger volume of air from inside the theater. The essence of both inventions was the recirculation of the heated air from the theater for mixture or blending with the conditioned air and varying the quantity of conditioned air. By such adaptation only a part of the air was conditioned, and the heated air drawn from the

room by mixing raised the temperature of the fresh air, thus eliminating the necessity of heating it in large amounts, and thus lowering the relative humidity and obtaining constant, wholesome air conditions in the rooms, regardless of atmospheric changes therein.

In the Ashland plant the moisture and humidity in the match room had its effect upon production, and the problem was to overcome these harmful conditions in drying the matches. As already pointed out, to accomplish the object the manufacturing company installed cooling coils and sprayer for conditioning, passing it through a so-called heat interchanger, and thence to the conditioner for cooling or dehumidifying, after which it was passed through or around the steam heater to a fan for discharge into the match-making room. The original installation was a heating system wherein fresh air or return air was introduced through the same duct. This was a known expedient in heating systems while the later addition of the washer apparatus was for drying the matches in summer. The steam heaters and interchanger were always used in summer, and all the air from the room passed through the interchanger in the manner stated before discharging, thus raising the temperature in summer before its entry into the room. According to the contract specification (Exhibit C in evidence), the relative humidity was controlled by means of a type R hygrostat which controlled the volume of air from the room while the refrigerating plant was operated, the same control, with a relay, furnishing fresh and recirculated air during the use of the heating system. It was designed to adapt the conditioning feature solely for summer use, while at other periods the heating system with varying damper controls was used for heating. There was contradictory testimony as to the use of the dampers 17 and 19 in the summer, the defendant claiming that in operation each had the capacity of producing a complete change of air in the match-making room, while plaintiff's testimony, considered in connection with the contract specification (Exhibit C), indicates that dampers 17 and 19 were firmly closed or blocked in summer, and consequently that no return air by-passed as in complainant's patents. Beymer, who had charge of the system, stated that drying matches would be impossible with the by-pass damper open, thereby allowing the return of unconditioned air because the moisture in the air drawn from the operating room would not then be eliminated, and that, upon sealing the dampers 17 and 19, a full quantity of cooled or fanned air flowed into the room and thoroughly dried the matches. Plaintiff's witnesses Mason and Wey also testified that the fresh air passage was blocked and the conditioner put out of use. I discover no reason for disbelieving this testimony. In plaintiff's patents, the by-pass damper is always open or partially open, depending upon fluctuating air conditions, to insure continuous by-passing of air in quantities from the theater for mixture with the fresh, conditioned, and reheated air. It was never intended, I find from the evidence, that air from the match room, or return air, should be by-passed for recirculation or for proportioning conditioned and return air; for to have done so, it is elicited, would have defeated the drying purpose, which in its accomplishment simply required conditioning to remove excess moisture without by-passing it. None of the air taken from the match room was used for reheating or tempering cooled air from the conditioner. It was not a system wherein heated air in varying amounts was drawn from the match room for recirculation or by-passing and mingling with cold conditioned air to affect its temperature. In plaintiff's patents, as heretofore shown, the greater volume of warm air taken from the theater and mixed with fresh air to attain a comfortable temperature was of considerable economic value. Reheating of conditioned air in summer, involving expense, was avoided. At the match plant the damper control did not function in summer to admit continuous by-passing of large quantities of air from the match room for blending with conditioned air for recirculation; its fan capacity being limited solely for using a specific amount of conditioned air, and the dampers 17-19 were operated only in winter.

Although defendant claims that the damper 17 in the prior use structure when open had a capacity of nearly 15,000 cubic feet, and the open recirculating damper 18 nearly a similar quantity, the fresh air damper 13,-500 cubic feet, and that with the fan 70 per cent. of air was capable of by-passing and recirculating in the match room—the dampers 17 and 19 being controlled by the hygrostat —still I find that none were maintained in intermediate positions under summer operations to furnish constant by-passing of the air into the room. Regardless of whether the dampers 17-19 opened slowly or gradually, they did not function at all times to by-pass air, since conditioning return air requires about 50 per cent. or more of by-passed air to maintain proper ventilation and tempera-

ture. Plaintiff's contention, based on the assumption that, if the dampers moved slowly from one extreme to the other, by-passing would stop on reaching a closed position, is not without merit, for in such event cold, conditioned air only would be recirculated in the theater—something the patentees avoided. Notwithstanding the earnestness of counsel for the defense in their efforts to invalidate claims 13 to 14 of the Lewis patent and claims 1 to 20 of the Fleisher patent I am constrained to the view that the structure was not operated upon the same principle as plaintiff's. It may be conceded that the structure at the match factory closely approached the inventions in suit but, since it was not designed to accomplish the same result, and, in my opinion, was incapable of doing so, it was not anticipatory. It was not similar to the system used in the Rochester theater, for the required volume of by-passed air necessary for mixing with conditioned air was far in excess of any that could be supplied by the Ashland plant. The defendant, to anticipate the patents in question, was required to prove beyond a reasonable doubt that the Ashland structure was complete and capable of operating and achieving the identical result of the patents in issue. It has failed to do so. It is doubtful whether the structure was of such a character as to enable persons skilled in the art to produce plaintiff's ventilating systems and their results by mere mechanical alteration or improvement. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821, and see Cantrell v. Wallick, 117 U. S. at page 695, 6 S. Ct. 970, 29 L. Ed. 1017. To anticipate, the prior structure must have been identical in substance and effect and in the means by which the functions of plaintiff's inventions were performed. Volume 1, Robinson on Patents, p. 310, § 236. Although I have considered all the matters and arguments drawn to my attention in defendant's brief, I discover no satisfactory evidence or reason for holding the patents in issue anticipated. A decree for plaintiff may be entered.