## GRAY v. EASTMAN KODAK CO. et al.

### No. 4986.

Circuit Court of Appeals, Third Circuit.

Aug. 22, 1933.

Rehearing Denied Oct. 31, 1933.

Thomas Raeburn White and Leon Edelson, both of Philadelphia, Pa., for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City, and Ballard, Spahr, Andrews & Ingersoll, of Philadelphia, Pa. (Wm. H. Davis, George E. Middleton, and Charles W. Riley, all of New York City, and Boyd Lee Spahr, of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below Charles B. Gray brought an action at law against the Eastman Kodak Company, charging infringement of patent No. 1,314,867 granted to him September 2, 1919, for a power transmitting mechanism. On trial the jury found a verdict for the plaintiff of $153,553.18. Thereafter the trial judge, feeling there was error in the trial, set the verdict aside. Thereupon the parties, by stipulation filed in court, waived a trial by jury and agreed "that the case shall be submitted to the Court for decision upon the record already made * * * both parties to have the right of appeal as in other cases." In substance, the trial was a quasi demurrer. No witnesses were examined. On final hearing neither party asked for any special findings of fact, for there were no disputed facts. The trial judge, holding the patent did not involve invention, directed "judgment may be entered for the defendant." Thereupon the plaintiff took, and the court sealed, "this bill of exceptions to the ruling, opinions and action of said Court," and thereafter granted the appeal the parties had stipulated.

The case concerns kodaks, or small hand carried photographic outfits, which, by rapid shutter action, turn off or on light from its chamber (for the Latin word for a chamber is "camera") and makes possible the instantaneous taking of what are fittingly termed "snap shots." It will thus be seen that the nonmoving or nonjarring of the camera and the dependable action of its shutter are vital elements in the kodak art. The shutter actuating mechanism of such art, prior to Gray's patent, consisted of a hollow rubber bulb, held by the operator in the hand and connected by a small tube with the shutter-controlling mechanism. Pressure of the bulb or release of pressure moved the shutter. In the large cameras of photographic studios the rubber bulb is still in use. In the kodak art, where it was once universally used, it is now seldom seen, and not at all on new cameras.

Now while the rubber bulb on the shutter mechanism was flexible, nonkinking, and sprang back to place when bulb pressure was released, it nevertheless was subject to deterioration; the rubber lost its spring, and replacement was required. The proofs show a consequent effort by the art, both here and abroad, to get away from pneumatic pressure, or an air pressure column, and substitute therefor a metallic or what is termed a "cable release" plunger pressure. This cable release or plunger consisted, in the first effort to get away from the rubber tube, of a small wire cable, and later of a noncompressible or close-wound spring. As this transition from a pneumatic to a metallic thrust has been eventually perfected, we now see that the goal to be reached, in order to make a satisfactory mechanism, was a unitary structure which coupled together the different elements of rigidity of the plunger, the flexibility of such plunger, and positive resiliency of the plunger, for plunger rigidity was necessary to effect the thrust. So, also, flexibility was necessary to obviate kinking; and active resiliency was required to spring the plunger back to normal shape and position. In other words, it was necessary to obtain the positive thrust and at the same time avoid kinking of the structure as a whole. This was eventually effected in the simple mechanism of Gray, who was an experimental engineer for twenty years. The steps that were taken by him to reach this result we now consider. His device is now in universal use. But in order to appreciate what Gray actually did to solve the problem we must recognize the essential difference between a spaced, open-wound spiral spring which is compressible, and a close-wound spiral spring which is noncompressible. We must also recognize how objectionable was kinking; how desirable is a rubber-like flexibility; how the apparatus must be bent to the small space of a Kodak every time pictures are taken.

From the record it appeared the first step in the attempt to get away from the rubber bulb and tube of the art was the use, as a plunger, of a strand or a number of fine wires braided together. But while such wire could, under lengthwise pressure, bend and was in that sense flexible, yet it was likely to form an angle at the bending point and did not spring back to place or to normal shape. The result of this was that the wire plunger, when bent, was liable to stay "put," with the effect that when one tried to take another picture, the kinked wire plunger stayed "put" and one got no exposure and no picture because the shutter did not work. In the patent history of the development of the art the first attempt to do away with the objectionable wire plunger was made abroad in the German patent of 1902 to Wermann. He substituted for the wire plunger a spiral spring inside another coiled spring. At this point we note that both Wermann's spiral springs were close-wound and therefore noncompressible, because their close-wound coils had no open space between the leaves of the spring and, while these close-wound springs were bendable, and therefore, to a degree, flexible, yet

they were wholly different in operation from an open-wound spiral spring. This difference will be seen when the action of the open-wound, as contrasted with a close-wound, spring is closely observed. When such an open-wound spring is bent, the leaves freely separate to spring apart at the outer circumference and at the same time freely approach each other or compress at their inner circumference. In other words, bending of such open-wound spring makes it expand at its outer side and compress at its inner. The result is that there is in the case of the open-wound spring a free play in expansion and an active resiliency which, on release of pressure, brings the open-wound spring back to normal. Now it is quite evident, as the subsequent development of the art proved, that no successful plunger can be made unless an *outer* open-wound spring is used for enveloping. Wermann, it is true, made a step forward in substituting a spiral close-wound spring plunger for a rigid wire. He got a plunger which was rigid yet measurably flexible, but around such close-wound plunger spring he took the fatal step of placing another close-wound spiral spring. So near the solution of the problem was he, that had he used an open-wound spiral spring to envelop his close-wound spring plunger, he would then have solved the problem which Gray solved many years later. But Wermann failed to take this vital step, precisely as the great Eastman Company, with all its experience and expert skill, failed to take it years later. As a result Wermann's device failed and made no impress on the camera art, which continued to use the pneumatic or rubber tube. No one to-day would think of using Wermann's combination of a close-wound, noncompressible, spiral plunger and a close-wound non-compressible, spiral sleeve as an enevolpe. While Wermann suggested the use of a noncompressible spiral spring plunger (which is used in the present art) his contribution to the art was to teach it how to make it not work because of the close-wound spiral spring he used as an envelope.

The next attempt was also made abroad in the British patent of Edwards in 1905. As we understand, Edwards differed, inter alia, from Wermann in one vital particular; he discarded the close-wound spiral plunger of Wermann and went back to the objectionable wire or wire plaited rigid plunger of the old art. In that regard the court below held, and rightly so, that the disclosure of Edwards' patent of 1906 "as to the innermost member means what the plaintiff says it does, namely, that it may be formed of wires held together by a closely coiled spiral and that it does not call for a closely coiled spiral alone." This conclusion is strengthened by the fact that the same Edwards in his American patent of 1906 shows the innermost metallic pusher as being wire, saying, "b is the flexible innermost member and is advantageously composed of a strand of thin flexible wires in such wise as to be incompressible under the strains (pressure) to which same is normally liable." Subsequent development shows conclusively that the use of a wire plunger was fatal to the utility of Edwards' device. Instead of advance in the art, Edwards made a backward step in his use of kinking wires which had proved fatal. Edwards taught the art nothing except to avoid his precept and example. Like Wermann, Edwards' was not an enlightening and helpful white light, but a red light showing what the art should avoid.

Our attention is also called to the patent to Duryea, No. 1,072,439, of 1916. But this shows an even more radical departure from the mechanism by which the plunger problem was finally solved. Duryea went back to an incompressible outer spiral. "I overcome," he says, "these objections by rendering the flexible *outer* member *inextensible* as well as *incompressible*." He used *wire* for his plunger instead of a spiral, as his patent says, "and by using for the inner member a *wire* of high elasticity."

It will thus be seen that up to 1917 the problem of a successful metallic plunger had not been solved and a great company like the Eastman, with its skilled engineers, continued to use the rubber bulb with the pneumatic push. In applying for its assigned patent No. 1,297,327, through one of its employees, recognition is made by the Eastman Company of existing difficulties in cable or plunger devices, as follows: "Our present invention relates to photography and more particularly to shutter actuating devices of the type known as cable release, in which two laterally flexible members, one working within the other and terminating in relatively movable finger pieces, are connected, respectively, to a shutter casing and an operating part thereof to afford a means for actuating the shutter without jarring the camera and in a convenient and comfortable manner and the invention has for its object to increase the flexibility of the members so that extreme distortions thereof will not result in permanent kinks or bends that would interfere with the relative sliding movement of the members." These objects of plunger nonkinking and camera nonjarring Eastman's patentee sought

to obviate by sleeving one wire spiral within another, *but Eastman's fatal mistake was that both spirals were close-wound.* The specification describes the inner spiral as "closely-wound incompressible wire helix." It is further described as being "as flexible as the outer helix 5 and more so." We therefore have in this Eastman employee's patent a *close-wound incompressible wire plunger and an enveloping close-wound noncompressible spiral spring* even less flexible than the inner one. From this it will be seen that no one in the art up to 1917 had placed a close-wound spiral plunger inside an open-wound spiral.

In 1918, sixteen years after the German patentee, and thirteen years after the British patentee, failed to solve the problem, the plaintiff applied for the patent in suit. Without at present entering into details, it suffices to say that he therein disclosed for the first time in the kodak art a *close-wound* spiral wire spring as a plunger and an *open-wound* spiral tube surrounding it. This is aptly stated in the opinion of the trial judge, who says: "It is the plaintiff's claim, however, that he first invented the combination of a *closed* coil for the thrust member with an *open* coil for the sheath. By a closed coil is meant one in which the spirals are in contact throughout so that the whole is incompressible lengthwise. In an open coil the adjacent spirals are spaced. Both in his testimony at the trial and through his counsel in argument the plaintiff urged that this combination of closed inner and open outer coils is the essence of his patent and his real contribution to the art." ·

It is also shown by Gray's drawings and specification, which latter reads as follows: "This mechanism comprises two important features. One of these is the *closely-wound* coiled wire transmission tube, J, connected with the stem, F, and the slide member, I, whereby there may be transmission without lost motion. The other of these features is the forming of the outer coiled wire tube, G, in such manner as to permit bending the tube without material separation of the coils at the outer side of the curve, *the spacing between the coils* permitting the coils to approach each other on the inner side of the curve while the tube is being bent. The member, I, being free to slide, the adjacent end of the inner wire tube, J, is free to move endwise when the mechanism is being bent. In this manner, the inner tube, although closely-wound, adapts itself to the bending without kinking. Practice has shown that a mechanism of this construction may be bent an indefinite number of times without kinking or otherwise disabling the coiled wire tubes." The résumé of the prior art shows Gray's patent first disclosed this combination. Assuming such was the case, the court below held this novel combination was a mere aggregation or selection of previously known objects, and the combination did not involve invention. In other words, the patent of the man who solved the problem and made the metallic plunger work is declared void by reason of patents of men which did not work and disclosed no such combination as did Gray, of a close-wound inner coil and an open-wound enveloping outer coil.

Turning to that question, we note the three requirements of a valid patent—novelty, usefulness, invention. As to the first requirement, there is no question. The proofs simply show, and there is no proof to the contrary, that prior to Gray, no one had disclosed that combination. It was therefore novel. As to its usefulness, it is shown that after the defendants saw Gray's combination, they ceased making other types, and concede that since then they have made and marketed one million of Gray's device. The defendants' adoption and use prove its usefulness. In that regard this court, in Consolidated Window Glass Co. v. Window Glass Mach. Co. (C. C. A.) 261 F. 362, held that: The imitation of a thing patented by a defendant who denies invention has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.

Was it inventive? The testimony of defendants' witness, Christie, who was the general foreman in charge of Eastman's experimental work, is conclusive and uncontradicted. Christie testified: ·

"Q. Did you remain with the Eastman Company continuously from 1913 to date? A. The latter part of December, 1917, I enlisted in the army, and was discharged and returned to work at Eastman Kodak in May, of 1919.

"Q. When you went to the war, what type of cable release was the company manufacturing? A. They were manufacturing the close-wound outer casing and close-wound coil cable.

"Q. Before you went to the war they had substituted the close coil inner cable for *straight wire* cable? A. That is right.

"Q. And when you came back from the

war what were they manufacturing? A. They were manufacturing the *spaced open wound* outer casing and the close coil cable.

"Q. That is the present construction? A. Correct.

"Q. Can you tell us the purpose and effect of these changes in the construction of the release? A. *Each change was an attempt to obtain a more flexible cable release.*

"Q. That is the *coiled push member* or cable was more flexible than a *straight wire* cable is that right? A. It was.

"Q. *And the open coil casing was more flexible than the closed coil casing?* A. It was."

But not only was there no contradiction of this affirmative proof of this witness in charge of the Eastman's experimental work, but the contention of lack of invention was evidently an afterthought, for at the first trial no such contention was made. In that regard, at the jury trial, the judge stated to the jury: "I have called your attention to these three elements—invention, utility, novelty. Invention, as I understand it, is not in real controversy here. So, you need not trouble yourselves about it."

We here again note, for it cannot be too strongly stated, that in this case there are no disputed facts. The significant, undisputed facts are that both close-wound and open-wound coil springs were well known mechanisms in use in the Kodak art. The further undisputed fact is that Gray was the first to use in combination a close-wound interior coil and open-wound exterior coil, and the consequent crucial question is, Did such conjoint use involve invention? On that question the trial judge made no finding of fact, but confined himself to an expression of opinion, saying: "I am unable to see how the advantages of the particular types selected by the plaintiff for each of these members are enhanced or in any way affected by the character of the other member; or to find anything new in the functional relationship between them." Not only has this expression of opinion no testimony in the record to support it, but, as we have noted in the evidence produced by the defendant itself in the testimony of its witness Christie, quoted above, the proof by this experimental man, the foreman of Eastman's experimental work, is that by the combination of Gray's close-wound inner and open-wound outer coils a new and increased flexibility was obtained, and that to such a degree that this great company, as soon as Gray showed them his device and they cut open the exterior textile jacket to see *how* this flexibility was effected, at once abandoned their rubber device, ignored and abandoned the attempt of their employee to supplant the rubber tube practice, and immediately began to make Gray's device by the hundreds of thousands, and wherever the Kodak goes, Gray's tube goes with it to make it dependable. Christie's proof of the combination's increased flexibility is undenied and undeniable. Here stands the defendants' undenied proof:

"Q. When you went to the war, what type of cable release was the company manufacturing? A. They were manufacturing the *close-wound outer* casing and *close-wound coil* cable.

"Q. Before you went to the war they had substituted the close-coil inner cable for straight wire cable? A. That is right.

"Q. And when you came back from the war what were they manufacturing? A. They were manufacturing the spaced *open-wound* outer casing and the *close-coil* cable.

"Q. That is the present construction? A. Correct.

"Q. Can you tell us the *purpose* and *effect* of these changes in the construction of the release? A. *Each change* was an attempt to obtain a more flexible cable release.

"Q. That is the coiled push member or cable was more flexible than a straight wire cable is that right? A. It was.

"Q. And the open coil casing was *more flexible* than the closed coil casing? A. It was."

In the face of such testimony, produced by the defendant itself, in the absence of any proof to the contrary, and in view of the *sale* of a million of the Gray combination, it will be seen that, with all due respect to the statement of the trial judge that he was "unable to see how the advantages of the particular types" were "enhanced or in any way affected by the character of the other member," his opinion must, and should, give way to the proofs in the case furnished by defendant's witness and by the action of his company in abandoning the old practice and taking up Gray's device.

To the contention of the defendant that Gray's new combination of old elements had no patentable merit, the sufficient answer is Christie's testimony as of old, "out of thine own mouth do I convict thee." Moreover, in addition to this proof of the new function of increased flexibility, we think the trial judge

failed to give due weight to the presumption of invention arising from the grant of the patent. In the proceedings in the patent office, there were, as is here the case, no disputed facts. Open-wound coils and close-wound coils were known agencies. Gray's combination of an open-wound coil enveloping a close-wound coil was new, and the sole question before the Patent Office, as here, was whether such combination of the two warranted, under the law, the grant of a patent. This question of law was decided in favor of the patentee, for as we have said there was no conflict of fact before the Patent Office, and under the authorities raised a presumption of law that the device involved invention. In that regard the Supreme Court, in Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 447, 55 L. Ed. 527, said: "It [the invention] possesses such amount of change from the prior art as to have received the approval of the Patent Office, and is entitled to the presumption of invention which attaches to a patent."

And where, as here, all the alleged anticipatory patents now cited were considered by the Patent Office, the presumption is materially increased and the grounds for invalidating the patent must be correspondingly greater. See cases cited in Walker on Patents (6th Ed.) § 535.

Moreover, apart from the undisputed facts and from there being the proof of the increased flexibility of the Gray combination, we think the patent should not have been held invalid. There being no question as to the facts, the court below was confronted with the legal question of whether the making of the combination, which was novel and useful also, involved invention. In that regard the court held: "Taking the question in its broadest aspect and assuming, as the plaintiff contends, that all the claims (including 1 and 2) can be so construed as to include the combination which he says constitutes his real invention, *I am satisfied that it amounts to nothing more than an assembly of two selected elements, neither of them new, without any new joint function, and hence is unpatentable.* Of course, they cooperate and whoever first combined a flexible inner thrust member with a flexible outer sheath in a cable release may have produced a real invention, but when that had been done, and especially after coiled wire tubes had been evolved for both members, the selection of superior forms of coils from the prior art produced no new result as the product of the combination. Whatever advance there may have been was simply an aggregate of several results, each the complete result of one of the combined elements. The principle is too well established to require citation of authority."

Was the court right in so holding? In taking up that question, we have this situation: The use of a plunger or inner member of a close-wound noncompressible spiral spring was old. Wermann used it in Germany and the defendant had used it in America, but neither of them had sleeved it in an open-wound coil. So, also, the use on an outer or envelope member of close-wound coil was old. It had been so used in Britain by Edwards, but he used it as an envelope around a wire plaited plunger. Now the concept of Gray was to take the two well-known devices of the prior art and for the first time use them conjointly; the close-wound coil as a pusher or plunger, and the open-wound coil as an envelope. What was the effect of this novel combination? Christie answers that question. By this novel union Gray got a photographic mechanism which was so superior to prior devices that it superseded and displaced all other and has been used by over a million users who bought from the defendant. Why this almost unprecedented result? A study of the prior structures and the exhibits in the record shows that Gray has produced a device which, while it retains the pusher rigidity of a wire, has done away with kinking and has furnished a mechanism which is as soft to the touch and as flexible as the rubber device of the old one which was abandoned, and at the same time has given a nonkinking plunger that is as rigid as a stiff wire. In other words, Gray gave to the Kodak the pliable, nonkinking features of the rubber tube, while at the same time he has retained the rigidity of a metal pusher without destructive kinking. This has been done not by merely using the two different kinds of coils, but by using them in a new relation, namely, by using the close-wound coil in the only place where it can be functionally modified by the outer open-wound coil and by using the open-wound coil in the only place where it can be modified by the inner placed close-wound coil. If Gray's relative positions were changed, if his open-wound coil was placed on the inside, and his close-wound one on the outside, if both coils were close-wound, or both were open-wound coils, such changes would be fatal. It is the new inner and outer positions and relations in which these two different kinds of coils are placed that enables the outer coil to affect the inner and the inner to affect the outer as they never had before. This fact, for such it is, of

the two coils, due to their relative position, affecting each other, is so original and seemingly so nonapparent as to lead to the belief that there is a mere aggregation of noninterlocking parts. But treating it as an aggregation with no new resultant function shows how really inventive, when duly appreciated, the new combination was. It took original thought to conceive and effort to embody the conception in practice. The effect of the novel combination of the two well-known types of coils would occur only to the inventive mind, for other types of mind would naturally suppose that, used conjointly, they would operate in the old way. But the outcome proved otherwise. Moreover, the union of the two, one enveloping the other, only came after attempts for years to improve cable release. Enveloping the pusher member with a spring was known. The rigidity of a close-wound coil was known. So, also, was the expansibility of a loose-wound coil. Yet, strange as it seems, no one, prior to Gray, thought of nesting the former inside the latter. And when Gray disclosed it, as he did when he sent one of his devices to the defendant, it was jacketed by a textile cover. The defendant evidently could not understand how the rubber-like flexibility was effected, and Gray's testimony, while not of facts, has the impress of certainty when he testified: "The cover was evidently slitted to see what was in the inside, to see the construction." They cut it open to see by what means he did it, at once recognized its worth, discarded their then type and adopted his. Now that it has proved its worth, his device deserves judicial recognition and its infringement due money reparation. The proofs show defendants have profited largely from it.

■ Why should they not now share that profit with the one who devised it? In answer to this question it is contended that under the pleadings and procedure in this case the decision of the trial judge is final and conclusive on the question of invention. In effect this means that if the Circuit Court of Appeals, and consequently the Supreme Court, should be of opinion there was invention, and that of a high order, they are powerless to so decree. We cannot concede the helplessness of appellate tribunals to right such a wrong, and we think the authorities support such conclusion.

It will be observed that there is, and was, no dispute as to facts. No terms of art were involved. The specification was self-explanatory. The elements were all old. No issues of fact were raised. The defendant, by the testimony of its witness Christie, conceded the increased flexibility effected by the combination. In addition to which there was the presumption of law created by the grant of the patent. Such being the situation, the case falls within the principle laid down in Heald v. Rice, 104 U. S. 737, 749, 26 L. Ed. 910, where, in reviewing an action of law on a patent, the Supreme Court, referring to the question of identity of *invention*, held: "In the present case the question of the identity of the invention in the original and reissued patents is to be determined from their face by mere comparison, notwithstanding what was said in Battin v. Taggert (17 How. 74 [15 L. Ed. 37]), and consistently with Bischoff v. Wethered (9 Wall. 812 [19 L. Ed. 829]), according to the rule laid down in Seymour v. Osborne (11 Wall. 516 [20 L. Ed. 33]), and Giant Powder Company v. Powder Works [98 U. S. 126, 25 L. Ed. 77], supra. That is, if it appears from the face of the instruments that extrinsic evidence is not needed to explain terms of art, or to apply the descriptions to the subject-matter, so that the court is able from mere comparison to say what is the invention described in each, and to affirm from such mere comparison that the inventions are not the same, but different, then the question of identity is one of pure construction, and not of evidence, and consequently is matter of law for the court, without any auxiliary matter of fact to be passed upon by a jury, if the action be at law."

Moreover, the case falls within the principle laid down in Singer Mfg. Co. v. Cramer, 192 U. S. 275, 24 S. Ct. 291, 295, 48 L. Ed. 437, where, in reviewing an action at law and referring to the question of infringement, which is more akin to a question of fact than is the question of invention, the Supreme Court (the italics are ours) said: "From the view we take of the case it is unnecessary to consider and decide any other assignment than that based upon the exception to the refusal of the court, at the close of all the evidence, to instruct a verdict for the defendant on the ground that 'no infringement whatever had been shown.' *As in each of the patents in question it is apparent from the face of the instrument that extrinsic evidence is not needed to explain terms of art therein, or to apply the descriptions to the subject-matter, and as we are able, from mere comparison, to comprehend what are the inventions described in each patent, and, from such comparison to determine whether or not the Diehl device is an infringement upon that of Cramer, the question of infringement or no infringement*

*is one of law, and susceptible of determination on this writ of error."*

This statement is, in substance, taken from Heald v. Rice, 104 U. S. 749, 26 L. Ed. 910, which was a review of an action at law involving the validity of a reissued patent and where the question of invention had to be determined, for if the original patent and the reissue were not for the same invention, the reissued one was invalid. In addition to the substance of what we quote above, the court held in Heald v. Rice, supra, that "the question of identity is one of pure construction and not of evidence, and consequently is matter of law for the court, without any auxiliary matter of fact to be passed upon by a jury, if the action be at law."

The same principle was followed in Market St. Cable R. Co. v. Rowley, 155 U. S. 625, 15 S. Ct. 224, 226, 39 L. Ed. 284, where the court reviewed the action of the court below in an action of law on a patent. Therein the court said:

"Did the court below err in refusing to instruct the jury to find a verdict for the defendant on the ground that the patent sued on was void for want of novelty?

"The defendant put in evidence a number of patents prior in date to the plaintiff's, and asked the court to compare the inventions and devices therein described with those claimed by the plaintiff. No extrinsic evidence was given or needed to explain terms of art, or to apply the descriptions to the subject-matter; so that the court was able, from mere comparison, to say what was the invention described in each, and to affirm, from such mere comparison, whether the inventions were or were not the same. The question was, then, one of pure construction, and not of evidence, and consequently was matter of law for the court, without any auxiliary fact to be passed upon by the jury.

"If, upon the state of the art, as shown to exist by the prior patents, and upon a comparison of the older devices with those described in the patent in suit, it should appear that the patented claims are not novel, it becomes the duty of the court to so instruct the jury."

The opinions in each of the three cases cited above show that the questions of infringement or validity in each were much more involved and complicated than the simple one before us. Had the present case been tried with a jury, it is clear that with no issue of fact involved, with the presumption of validity created by the grant of the patent, with the affirmative testimony of defendant's witness Christie showing gained flexibility, with no contradictory testimony whatever, it would have been the duty of the court to instruct the jury the patent was valid and infringed. That jury trial was waived in no way changed this question of law into one of fact or prevents this court from reviewing the action of the trial judge in holding this patent invalid.

■ The length of this opinion leads us not to enter into a discussion of the other points argued on behalf of defendant. All of them have had due consideration. We limit ourselves to saying we find nothing in the proceedings in the patent office to affect the validity of Gray's claims. His original application had an undue number of claims and duplications in many cases, and these were cut down. But we note that his specification sets forth one, and one only, basic alleged invention, namely, the close-wound inner and the open-wound enveloping coil which were clearly described, illustrated in drawing, and carried into claims one and two by the terms, "in a mechanism of the nature described," and "substantially as described," or, as said in Seymour v. Osborne, 11 Wall. 516, 547, 20 L. Ed. 33: "Where the claim immediately follows the description of the invention it may be construed in connection with the explanations contained in the specifications, and where it contains words referring back to the specifications, it cannot properly be construed in any other way." Such device was not shown in the cited prior patents, and therefore required no modification of the claims, and these claims were never modified beyond a minor change in adding an omitted element, viz., "a barrel in the outer head." Indeed, no reason appears precluding the allowance of patent protection for Gray's novel combination of the inner close-wound and the enveloping open-wound coil which the defendant has exactly duplicated. So holding, the judgment below is reversed, a new trial is granted, and the record remanded for due procedure in accord with this opinion.