## GRAVEL PRODUCTS CORPORATION v. BUFFALO GRAVEL CORPORATION.

No. 124.

District Court, W. D. New York.

Dec. 22, 1933.

Haight, Adcock, Banning & Fathchild, of Chicago, Ill. (George I. Haight, of Chicago, Ill., and Charles W. Parker, of Buffalo, N. Y., of counsel), for plaintiff.

John S. Powers and Harold I. Popp, both of Buffalo, N. Y., for defendant.

ADLER, District Judge.

This is a suit for infringement of a patent (No. 1,729,070) granted September 24, 1929, to Howard S. Gerken for improvements in apparatus for washing and separating or grading materials, as for instance, gravel from waterways, on an application filed February 27, 1926. The patent has thirty claims. Those in suit are claims 16 to 30, inclusive.

Corporate capacity and title to the patent are admitted. Infringement and validity

of the claims are denied. With respect to infringement, it is the contention that each and all of the claims in issue are either invalid, or, when interpreted by the prior art, do not cover either of defendant's constructions. To establish invalidity, defendant relies on patents of the prior art, on prior use, on prior knowledge, on abandonment, and on failure to disclaim under circumstances which it is alleged made disclaimer obligatory.

The invention of the claims in suit is described in the specification as "a washing, separating and grading apparatus particularly adapted to be used on a boat or scow, so that it can be positioned lengthwise of the boat over the hold or hatches, whereby the washed, separated material can be discharged from the apparatus into separate *compartments in the hold,* or delivered to one or another part of the hold, as may be desired, (in order) to segregate the different grades of material or evenly load the boat." The invention is described in broad terms in claim 30, as follows: (a) An inclined chute the length of which is many times its width; (b) means for delivering solid materials and a relatively large volume of water to the upper end of said chute and causing them to flow down the chute at a relatively rapid rate, said chute having screened openings in the bottom at intervals along its length, each screened opening being adapted to discharge a small portion of the water and such of the materials as are small enough to pass through the screen; (c) secondary screening means arranged to receive the water and material from said screened openings in the chute and to divert laterally the larger particles thereof, said secondary means being adapted to pass the water and other particles received from said screened openings; and (d) means for receiving *all the water and finer particles passing through said screen means and conveying them away by the flow of the water content thereof.* (The italicizing is not in the patent.)

It is the contention of defendant that claims 16, 18, 22, 26, 28, and 30 are "completely anticipated in terms and substance by the prior art"; that claims 23, 24, and 25 are "anticipated in substance by the prior art and substantially anticipated in terms"; that claims 27 and 29 are "completely anticipated in terms and substance," provided "the express limitations are ignored"; and that the remaining claims are "void for want of invention."

The object of employing means for collecting and conveying away the water and finer particles, the function of element (d) of claim 30, is explained thus in the specification: "In apparatus heretofore used, the sand and water were discharged directly into the hold or compartments of the boat, the water being gradually displaced by sand settling in the hold until the water finally overflowed the hatch combings and thence went overboard."

The patents of the prior art relied on as *anticipations* are patent to Roberts, No. 997,-854, patent to Thompson, No. 1,149,989, British patent to Wilkinson, No. 25,823 of 1913, and patent to Woolley, No. 349,675. Of these the Thompson patent and the British patent to Wilkinson were considered by the Patent Office as citations against Gerken's application. The patents of the prior art relied upon as disclosing "various details of the Gerken construction" are patent to Keller, No. 126,968, patent to Schultz, No. 174,981, patent to Jewett, No. 475,568, patent to Diers et al., No. 1,165,077, patent to Kavanaugh, No. 583,259, patent to Stetson, No. 714,755, patent to Evans, No. 1,032,746, patent to Hoyt, No. 1,064,223, patent to Mark, No. 1,-269,947, patent to Lamb, No. 1,368,267, French patent to Rey, No. 415,130 of 1910, and German patent No. 291,693 of 1915. Of these prior art patents the following were considered by the Patent Office, namely: The Keller patent, the Diers patent, the Kavanaugh patent, and the Marks patent. The patents relied on as *anticipations,* and which were not cited by the Patent Office, are the only ones that need be considered specially, viz.: The Woolley patent and the Roberts patent.

The Woolley patent is on a coal separator adapted for installation at the mine. The oversizes are scalped by a grid screen in the chute that receives the coal. The material passing through the screen falls upon a secondary screen of gablelike form, employed for grading purposes, each end of which discharges into a bin. On comparing the structure of the Woolley patent with that described in broad claim 30 of the Gerken patent in suit, it is seen that the structures are designed for different purposes; that the Woolley structure is not adapted (with any modifications that are obvious or that have been suggested) to be used on a boat for washing and separating gravel; and that the Woolley structure does not suggest the long, inclined chute of the patent in suit, with its screened openings, adapted to receive water in volume at its upper end; nor does it employ means for receiving all the water and finer particles passing through the screens

and conveying them away by the flow of the water. The Woolley patent does not anticipate claim 30.

The Roberts patent was not cited by the Patent Office. It shows and describes a washer designed for treating "pebble phosphate and the like." It is constructed so that it can be set up on the deck of a dredge, where the material from the bottom of the waterway can be pumped into it. It·has an inclined trough or raceway, with a grating in the bottom. From the surface of the grating (at its lower end) is discharged into a chute that projects from one side of the trough the materials that will not pass through the grating in the trough. During the travel of the materials over the grating in the trough, the finer stuff falls through onto an inclined screen from which it passes to other screens in chutes that lead to the sides of the barge, where the pebbles are delivered into scows, and the water and sand that flows below the screens is discharged overboard.

On comparing the structure of the Roberts patent with the elements of claim 30 of the patent in suit, it is seen that the structures are designed for different purposes; that the Roberts structure does not suggest the long, inclined chute of the patent in suit, with its plurality of gratings, each adapted to discharge sand and a portion of the water onto a secondary screen, or means (the lower parallel trough of the patent) adapted to receive the water and finer particles that pass through the secondary screen and convey them away by the flow of the water content. In the Roberts apparatus the transverse troughs that convey to the side of the vessel the water, sand, and pebbles that go through the screen located beneath the trough are not the equivalent of the lower parallel trough of the Gerkin apparatus, and, accordingly, Roberts is not an anticipation of claim 30.

The patent to Wilkinson, put forward as an anticipation, was considered by the Patent Office. It describes apparatus for washing and grading gravel, sand, and the like, and comprises (a) a casing or trough in combination with (b) a series of primary screens of different mesh (the finer mesh at the top) supported within the casing and so arranged that the material passes from one screen to another and the graded material is delivered from the respective screens; (c) another screen of fine mesh behind the graduated screens and diagonally across the casing, which extends from the top to the bottom of the casing (to make it possible to change the screening effect of the middle primary screen); (d) another screen arranged between the two first mentioned to produce the required screening effect with the upper primary screen; (e) still another screen of fine mesh, behind the before-mentioned graduated screens, extending diagonally across the casing, from top to bottom, divided by partitions across the casing, located at the lower end of each primary screen, to form compartments, each having an opening through the side wall of the casing, just above the lower end of the partition, to which a chute is attached. In use the material passes over the screens by gravity. During its passage over the screens by gravity. During its passage over the primary screens, the material is washed by water discharges from pipes connected to a suitable source of supply, preferably in the form of spray, which is stated to facilitate the passage of the material through the screens. The material that does not pass through the primary screen falls off the end thereof, and then off the lower end of the casing. Obviously it is not contemplated that the Wilkinson apparatus shall be used on a boat to separate gravel that has been sucked up from the bottom of a waterway and discharged into gravel boxes on the deck or into the hold of a boat by a stream of water under high pressure. Such a process and the problem involved had no part in the designing of the Wilkinson apparatus. The British patent to Wilkinson does not anticipate claim 30.

■■ The other patents cited as disclosing features resembling structurally or functionally the elements of the claims in suit need not be discussed.in detail. It is apparent on inspection that separately considered they do not anticipate. As pointed out above, many of the patents of the prior art cited in defense were considered by the Patent Office, and the claims sued on were allowed over them. In infringement suit .the courts apply the rule that, when it has been held by the Patent Office that the structure described in the claims is patentable over the prior art, the patent is entitled to the presumption of invention that attaches to a patent. And, when patents alleged in defense to anticipate were considered by the Patent Office, the presumption is materially increased. Walker on Patents (6th Ed.) § 535; Gray v. Eastman Kodak Company, 67 F.(2d) 190, 193 (C. C. A. 3).

In this connection it should be noted specially that broad claim 30 was inserted by an amendment dated August 9, 1929, that was filed after a long discussion devoted to drawing the line between the prior art and Gerken's real invention, and was allowed as filed.

The prior use relied on is the use of certain gravel washing and separating apparatus that was first put into use on the Burton about 1905 and later transferred to the Trenton.

Before an intelligent comparison can be made between the construction and functions of the apparatus of the patent in suit and the apparatus of the Burton, Trenton, and other vessels, that we are called upon to consider, it must be understood that some of these vessels were of the so-called flush-deck type, that were provided with cargo boxes located on deck to receive the gravel (to which the equipment used on the Burton and Trenton was adapted); that others (like plaintiff's gravel vessels Gerken and Niagara, and defendant's Carroll and Lakewood) were of the so-called cargo-hold type, that is to say, vessels in which the gravel after it has been washed and screened is delivered to cargo boxes in the hold; that in the case of vessels in which the gravel after having been washed and screened is deposited on deck in cargo boxes some of the finer may be drawn off to be discharged overboard; that, when cargo boxes in the hold receive the gravel, after it has been washed and screened, it is necessary to discharge with the gravel into the hold water and finer particles that pass through the screens employed for separating out the gravel, unless means are provided for receiving them and conveying them away, to be discharged overboard or otherwise disposed of. Such also was the case in the use of the earlier single trough equipment, for then also both the gravel and water went into the hold. It should be noted also that when the water flows into the hold a "sumptank" in the hold is made use of in order that the water may be pumped out of the hold at the conclusion of the loading operation.

Defendant's vessels Carroll and Lakewood as first equipped in 1926 were provided with deck cargo boxes in combination with transverse screens from which the screened gravel was delivered into the boat and transverse troughs for disposing of the water. In 1929 these vessels were reconstructed so as to provide cargo space in the hold for the screened and washed gravel, and apparatus of the double, parallel chute description was installed, on which this suit was brought.

Captain Gamble's equipment of the Burton prior to 1905 has been described as comprising inclined single flumes extending athwartship with grids in its bottoms, secondary screens adapted to discharge the gravel coming off them into a starboard cargo box, and located below the secondary screens inclined troughs that extended in the opposite direction athwartship, to carry away the water and sand that fell through the secondary screens, and discharge it into a port cargo box. The Burton apparatus performed in the same way as the old single trough with its grid openings and overboard spillway. The Burton equipment is said to have been transferred to the Trenton in 1905, and it appears that Gerken was familiar with it. It is obvious that the equipment of the Burton does not afford a prior use that anticipates the invention described in claim 30 of the patent in suit. (The terms "chute," "flume," and "trough" have been used interchangeably by the witnesses and are so used in this decision.)

Much testimony was devoted to an inquiry regarding the possibilities of using apparatus of the deck cargo type and of the hold cargo type for grading purposes, the comparative results obtained, and to a comparison of the quality of clean gravel obtainable on treatment by these two types of apparatus. It appears that both grading and the quality of the product obtained depended so much on the character of the material sucked up from the bed of the waterway and skill and judgment in operation that comparisons are untrustworthy from the evidence. Such a finding, however, is not necessary to a decision. The question to be decided is whether the claims in suit, describing a two-trough apparatus designed for use in gravel vessels of the cargo-hold type and provided with means for receiving the water and finer particles passing through a secondary screen located beneath the main (upper) trough and conveying them away, are invalid in view of prior art patents cited, and/or the Burton prior use, and/or knowledge of the Charles Dick installation, and/or abandonment, and/or failure to disclaim.

Prior knowledge as a defense is predicated on equipment of the Charles Dick, a steamer of Canadian registry, dating from 1924 when the equipment was installed while the steamer lay at dock at Detroit. In the season of 1924 the Charles Dick operated in Canadian waters. In 1926 the secondary screen units were removed and some installed on the Baxter Dick, others on the O'Connor Dick.

According to testimony of witnesses produced by defendants to describe the installation on the Charles Dick, secondary screens were carried by boxes, which in turn were attached to a main flume provided with grids, controlled by sliding gates. The boxes also

provided inclined chutes below the screens that opened at their ends. Water, sand, and gravel passed through the grids in the main flume onto the secondary screens in the boxes, which served to scalp the gravel and discharge it into the cargo space. The water, sand, and silt flowed along the inclined chutes located below the secondary screens to lateral spillways from which they were discharged overboard. On the Charles Dick such a secondary unit was provided for several grids in the main flume. It is apparant that there was no essential difference between this equipment of the Charles Dick and that of the Burton.

Abandonment is also relied on, based on a crude experiment carried out by Gerken in 1920 on a boat called the Excavator on which he was employed, and on a disclosure in 1921 to his employer, Mr. Knowlton. It was shown on the trial that the drawing made at that time was designed to show how the Gerken invention could be installed on a steamer called the T. B. Phelan, then laid up at Kingston for repair, that Gerken was trying to persuade Mr. Knowlton to buy for use as a gravel boat. It also appears that at or about that time Gerken and Mr. Knowlton went to Kingston, saw the boat and opened negotiations to purchase it, which culminated in the purchase in the summer of 1925. As soon as the boat had been acquired, it was equipped with Gerken's apparatus and a patent attorney was employed by Gerken to prepare an application for a patent. The application was filed February 27, 1926. As a rule an inventor is encouraged to reduce to practice before filing an application, and in this case no intervening interests are involved, since defendant did not install the equipment of which complaint is made till 1929. Mr. Gerken's conduct appears to have been discreet and reasonable, and there are no grounds for maintaining the defense of abandonment.

It is accordingly held that claim 30 is a valid claim, in that it describes a separating apparatus adapted for use on gravel boats of the hold cargo type, of the character described in the specification, which includes as an essential and distinctive element means for receiving the water and finer particles passing through the screens and conveying them away by the flow of the water content thereof.

Other claims in suit on this same combination of elements, in which this same element is described as "an inclined second chute," and in some of which minor features are included, are claims 17, 18, 19, 28, and 29. Claims 16, 20, 21, 22, 23, 24, 25, and 27 do not mention a second chute, but describe secondary screens that are adapted to direct the gravel into the hold, and they also include "means adapted to discharge overboard the water passing through the chute screens and the secondary screens." Claim 26 describes the secondary screens as "arranged along the chute to receive the water, sand and gravel passing through said (the) primary screens and separate the gravel therefrom and discharge the gravel into the hold of the boat to the side of the chute." This claim (26) makes no provision for conveying away the water and finer particles passing through the secondary screens to discharge them overboard. Claim 26 is invalid in view of the prior use of single trough apparatus. Claim 27 is invalid in view of the Burton prior use and the disclosure of the Roberts patent and British patent to Wilkinson. The other claims in suit (16-25, inclusive, 28, 29, and 30) are valid and infringed by the structure on defendant's steamer Weston M. Carroll (shown in blueprint in evidence as Plaintiff's Exhibit 5), and also by the structure on defendant's steamer Lakewood (shown in blueprint in evidence as Plaintiff's Exhibit 6). Claims 16-29, inclusive, are distinguished from claim 30 and from each other by the way in which the elements are referred to, and in some cases by the inclusion of the gates that control the openings in the bottom of the upper chute for the purpose of diverting the gravel to the different locations in the hold at will, but the combination of essential elements is the same in all.

Defendants have alleged and argued that under sections 65 and 71, title 35, U. S. Code (35 USCA §§ 65, 71), on disclaimer it devolved on plaintiff to file a disclaimer in view of Gerken's knowledge of Captain Gamble's apparatus on the Burton. Inasmuch as it was necessary for the effect of that prior use on the validity of the claim of the Gerken patent to be determined by the pronouncement of a court, there has been no undue or unreasonable delay.