716

**McKAY CO. v. SHOTT MFG. CO.**
No. 919.

District Court, S. D. Ohio, W. D.
March 1, 1937.

Wood & Wood, of Cincinnati, Ohio, for plaintiff.

Murray & Zugelter, of Cincinnati, Ohio, for defendant.

NEVIN, District Judge.

This is an action for patent infringement. Plaintiff, The McKay Company, a Pennsylvania Corporation, is the owner by assignment of U. S. Letters Patent No. 1,-959,032, issued May 15, 1934, to William R. McGowen, and also by assignment of Design Patent No. 91,997, issued April 17, 1934, to Percival Goodman. The McGowen patent is for a "Swing" and "relates to swings and more particularly to those of the glider type." The Goodman patent is for a "Design for a Glider". The ownership of the patents by plaintiff and the manufacture by defendant of the particular glider alleged to infringe each of the patents in suit are admitted.

On April 20, 1935, plaintiff filed its bill of complaint herein, charging defendant, The Shott Manufacturing Company, with infringing both patents. It prays for relief by way of injunction, accounting and damages. The defenses against both patents in suit are the same, to-wit, invalidity and non-infringement. In each instance, however, the defenses principally relied upon, are alleged anticipation and prior uses by other parties.

McGowen Patent No. 1,959,032.

As to the McGowen patent the prior public use particularly relied upon is that of St. Charles Net & Hammock Company, of St. Charles, Illinois. It is, however, further contended by defendant that the McGowen patent in suit shows and claims nothing other than the use of flat metal strips or straps having spring steel characteristics in lieu of the flexible chains and other means for suspending the seat member from the stand member of the prior art or old type glider or swing, such as is shown in such old patents as Atkinson No. 1,650,-178 (Exhibit M—1); Ericson patent No. 1,953,752 (Exhibit M—7); Mintz patent No. D65593 (Exhibit M—13); Sisbower patent No. 1,566,044 (Exhibit M—15), and Lillibridge patent No. 1,798,546 (Exhibit 6); that while the McGowen patent claims the obvious and expected rigid attachment of the flat metal strips or straps at their upper ends to the stand member and at their lower ends to the seat member, and certain of the claims carry other limitations or qualifications, none of such other qualifications distinguish from the patented prior art. Nor does the limitation of "rigidly connected" spring strap suspension means distinguish from the St. Charles prior use.

At the beginning of the trial, counsel for defendant stated (Rec. p. 15), "Now, in addition to that which I have said, we of course have some prior art patents that we shall submit but which we do not rely on particularly because we are satisfied that the defenses established by the device made up in St. Charles, Illinois, as early as 1930 is an anticipation of the McGowen patent in suit".

In addition to the prior art patents just referred to, defendant introduced, among others, patent to Morse, No. 824,133, June 26, 1906 (Exhibit M—14); patent to Brewer, No. 430,616, June 24, 1890 (Exhibit M—3); patent to Sisbower, No. 1,401,286, December 27, 1921 (Exhibit N—4); patent to Birch, No. 9779 (British), April 26, 1906 (Exhibit N—2); patent to Kline, No. 347,-428, August 17, 1886 (Exhibit N—3); patent to Eaton, No. 1,173,654, February 29, 1916 (Exhibit N—5); patent to Couch, No. 1,862,953, June 14, 1932 (Exhibit N—7).

Reference is here made to these particular patents (just above enumerated) because they are specifically set forth and discussed in an opinion (later to be referred to) by Judge Hamilton, in the District Court, Western District of Kentucky, in the case of McKay Company (plaintiff herein) v. Logan Company, 15 F.Supp. 644.

In addition to the patents referred to by Judge Hamilton, defendant in the instant case calls specific attention to a patent to Delany, No. 871,571, November 19, 1907 (Exhibit M—6), and patent to Bean, No. 284,940, September 11, 1883 (Exhibit M—2), which latter patent defendant submits teaches everything that can be learned from McGowen—that Bean sought exactly the same swing action or motion as did McGowen. Bean patent No. 284,940 relates to a hobby horse and does not clearly recite that spring steel straps are contemplated. Rather, it states, "The hangers can be made of elastic material, strips of leather answering well, which may be rigidly secured at each end." As pointed out by the witness Briner (Rec. p. 144), if Bean contemplates using straps of flat spring steel they could not roll on the smooth pegs as shown in the patent drawing. Delany patent No. 871,571 relates to a grain sieve which is mounted on the upper ends of springs and vibrated rapidly through short amplitude of movement. Again, as stated by the witness Briner (Rec. p. 142), the difficulties of embodying such a structure in a glider are obvious and even if such an adaptation were made, it would not function satisfactorily as a glider because with the seat supported on the upper ends of Delany's vertical springs, there would be gravitational resistance to return movement of the seat from a deflected position, with long hold periods at the ends of the path of swing.

It is well settled that prior art patents are not a part of the prior art, except as to what is disclosed on their face; they cannot be reconstructed in the light of the invention in suit and then used as an anticipation or to repel novelty. Buckeye Incubator Co. v. Blum, D.C., 17 F.2d 456, affirmed, 6 Cir., 27 F.2d 333. Nor does the fact that various elements of the patented combination may be found in the prior art render the patent invalid. Frey v. Marvel Auto Supply Co., 6 Cir., 236 Fed. 916, 919.

As conceded by plaintiff, the Brewer (No. 430,616) and Morse (No. 824,133) patents are obviously the closest references. They were both cited by the Patent Examiner against the application for the McGowen patent in suit.

The file wrapper (Exhibit N) discloses that plaintiff's assignor's claim was

first rejected by the Patent Office because of the state of the prior art as illustrated in Morse or Brewer and in some of the other prior art patents hereinbefore referred to. It further shows that after various revisions of the claims and arguments to the Patent Office, the McGowen patent (with the four claims in suit) was granted notwithstanding the existence of these prior art patents. The presumption of invention which attaches to a patent was thus in this instance increased and the grounds for invalidating the patent must be correspondingly greater. Gray v. Eastman Kodak Co. et al., 3 Cir., 67 F.2d 190, 195; Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539, 560.

The court deems it unnecessary to discuss further the questions relating to these prior art patents, however, for the following reason—the trial of the instant case was held and the testimony taken before this court on March 12th, 13th and 14th, 1936. At that time there was pending before the District Court, at Louisville, Kentucky, (Rec. p. 5–6) the case (above referred to) of McKay Company v. Logan Company. Subsequent to the introduction of any evidence in the instant case (except Exhibits 26 and 26-a, which were admitted by agreement of counsel on November 23, 1936—the date of oral argument), to-wit, on July 16, 1936, the Logan Case was decided by Judge Hamilton, who, after discussing the prior art patents therein (and insofar as they are the same, herein), held the McGowen patent in suit here (and there) to be valid.

The McGowen patent in suit contains four claims. These (together with the objects of the invention) are set forth verbatim in Judge Hamilton's decision. They are all in issue here and were all in issue in the Logan Case.

On all questions bearing upon validity (not including the St. Charles use which it appears was not fully presented, or at least not pressed in the Logan Case) (Rec. p. 6), the court is in full accord with the views as expressed by Judge Hamilton in the Logan Case and adopts his conclusion and his reasons therefor in all respects as set forth in his opinion, the same as if repeated here. Obviously, having reached the same conclusion, it is unnecessary for this court to repeat what has already been so well stated by Judge Hamilton.

This leaves, therefore, in this connection, but one question for this court to determine which was not urged in or determined by the Kentucky District Court, though it appears that some evidence bearing on the subject must have been there presented; this is the claim of defendant that devices similar to those covered by the McGowen patent were made and sold by St. Charles Net & Hammock Company, of St. Charles, Illinois, at a time prior to the application for the McGowen patent. The reference made to this in the opinion by Judge Hamilton (15 F.Supp. p. 647) is as follows: "The St. Charles Net & Hammock Company catalogued and sold gliders before the patent in suit was issued, having many features of McGowen's glider."

Defendant introduced testimony by way of a number of depositions in support of its claim that devices similar to those of the McGowen patent were made and sold by the St. Charles Net & Hammock Company, of St. Charles, Illinois, prior to May, 1932, which is the earliest date established for McGowen's alleged conception of the invention. (Rec. p. 18). The first device (defendant claims) was made at the St. Charles Company one Saturday afternoon during July or August, 1930, by three men, named Hough, Durstock and Duane Lillibridge. These men are brothers-in-law. It is claimed that this device had the flat spring steel straps or hangers secured at their opposite ends to the stationary stand or frame and to the swinging seat parts by means of nuts and bolts, and that after the first device was made, it was shown to C. F. Benneke, a salesman for The John A. Roebling Sons Company, and that Mr. Benneke supplied other flat spring steel material for the express purpose of trying it out for use as a glider hanger or suspension material. It is claimed that Mr. Benneke first saw this device prior to September 16, 1930, and that this is positively established by Exhibit J (an "office order"). Mr. Benneke says he saw a flat strap type glider at the St. Charles Company's plant before he wrote Exhibit J.

Subsequently, additional devices of the same type were made, but they were not identical in construction with the first device. Messrs. Turner and Van Hiel were workmen who worked on these additional devices. Mr. Turner states (Dep. p. 8) "Instead of the spring steel being riveted onto the arm from the seat frame, we used a keyhole slot and a shoulder rivet, and 1¾" spring steel instead of 2"." These devices were tested but "the rivets crystallized at the bottom of the spring steel and

broke off * * * and also tore out on the spring steel." This was overcome by "reinforcing the bottom and top and using keyhole slot and shoulder rivets." It is claimed that these improvements are evident in the spring steel hanger, Exhibit B. Although this is a defective hanger, it is claimed that it is structurally identical with the spring steel hangers used by the St. Charles Company in its finished product offered to the trade and the first public display of which was made in the January, 1931 furniture show in Chicago. It was this type of glider that DeWitte saw and painted at the St. Charles Company's plant when he was first employed there in January, 1931.

It is claimed that the devices displayed and sold by the St. Charles Company were seen in January, 1931, by Allen Shott, President of the defendant company, while on display in the 1931 Chicago furniture mart or show. Mr. Shott testified that (Rec. p. 92), "I can't see any difference between the samples that the St. Charles Net & Hammock Company showed me on their floor and this McGowen patent 1,-959,032."

In connection with the depositions and in support of the oral testimony, defendant introduced a number of exhibits. Among others, Exhibits D, E, F, G—2 to G—6, inclusive, J and K—1 to K—3, inclusive. Some of these are with reference to spring steel ordered by the St. Charles Company, which defendant claims, as for example Exhibits K—1, K—2, K—3, G—1 to G—6, inclusive, show that the St. Charles Company tried out spring steel suspenders or hangers varying in width from 1¼ to 1¾ inches.

Defendant's Exhibit F is a price list. Defendant claims this was used in 1932 but was in existence during the latter part of 1931, and that it refers by code number to St. Charles Company's gliders, Nos. 1098B—2 and 1098B—6, and that the dummy price list "effective February 15, 1932" (Exhibit E), contains similar reference to St. Charles Company's glider No. 1098B—6, which it is claimed was created for use in 1932. Defendant further claims that the No. 1098 gliders were all of identical physical structure and were structurally identical to the glider shown in the photograph Exhibit C 5. This photograph is a reprint from a negative made in December, 1932. Defendant claims that beginning with the January, 1931 Chicago show, the St. Charles Company made similar gliders each and every year until it discontinued business in 1934.

In connection with this evidence offered on behalf of defendant, plaintiff submits that while the application for the McGowen patent in suit was filed October 27, 1932, the proof shows the conception of the McGowen invention to have been in May, 1932 (Rec. p. 18); a book entry thereof in July and August, 1932 (Exhibit 12-a); documentary evidence showing commencement of work on the first gliders in August, 1932 (Exhibits 13-a, 13-b); drawings of parts for the gliders in August, 1932 (Exhibits 15-a to 15-b), and shipment of two of the gliders to Chicago in October, 1932, for exhibition at the November Furniture Mart. (Rec. p. 25).

The testimony of the witness Bond, shows the shipment of two gliders in October (Exhibits 21-a, 21-b), and that additional gliders of this type were shipped in December, 1932, for exhibit at the January show. (Exhibits 22-a, 22-b).

Plaintiff submits that it is necessary for defendant to prove completion of a satisfactory spring strap glider by St. Charles Net & Hammock Company before the summer or early fall of 1932, and that such proof must be "free from reasonable doubt". United Shoe Machinery Corp. v. Day Wood Heel Co., 6 Cir., 46 F.2d 897, 898. In that case at page 898, the court say: "Anticipation cannot be proven alone by the number of witnesses introduced to support it. Barbed Wire Case, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; American Bell Tel. Co. v. People's Tel. Co., C.C., 22 F. 309. It must be determined by a consideration of the evidence in the aggregate, and, so treating it, the case is not free from reasonable doubt."

It is held in the Barbed Wire Case, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154, that the burden of proof is upon the defendant and every reasonable doubt should be resolved against him. On page 284, 12 S.Ct. on page 447, the Court say: "We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony * * * courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be

clear, satisfactory, and beyond a reasonable doubt."

Defendant submits that due to the different state of facts in each case, the rule stated in the United Shoe Machinery Case, supra, that such proof must be "free from reasonable doubt" is not applicable in the instant case, but that the rule that is applicable in the case at bar is one set forth by the Court of Appeals of this (Sixth) Circuit, in Buser et al. v. Novelty Machine Co., 151 F. 478, where at page 482 the court say: "Appellants seek a reversal of the decree appealed from mainly on the ground that this defense was established by the evidence, and that the lower court erred in not so holding. In considering whether this position is well taken, it is to be borne in mind that the rule is that, in order to invalidate a patent by oral testimony of prior invention, it must be such as to convince one beyond a reasonable doubt of that fact. Washburn & Moen Mfg. Co. v. Beat 'em all Barbed Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154. This court, in the case of American Roll-Paper Co. v. Weston, 59 F. 147, 8 C.C.A. 56, invalidated a patent on oral testimony of prior use. And in the recent case of Columbus Chain Co. v. Standard Chain Co., C.C.A., 148 F. 622, it refused to uphold a later patent on oral testimony as to invention by the patentee thereof prior to an earlier one. Is, then, the evidence in this case sufficient to satisfy one beyond a reasonable doubt that plaintiff's patents were anticipated by defendants' prior invention?"

Without attempting an analysis of the cases in order to determine in what respect, if any, the rule as claimed by defendant differs from the rule as claimed by plaintiff, the court, for the purposes of this decision, will adopt the rule as contended for by defendant and, as stated in the Buser Case, leave the question to be answered, therefore, in this, as in that case, "Is, then, the evidence in this case sufficient to satisfy one beyond a reasonable doubt that plaintiff's patents were anticipated by defendants' prior invention?" (In the instant case an unpatented device, however).

Defendant claims that the evidence adduced in its behalf clearly establishes the prior use with that certainty and conclusiveness necessary to comply with the rule established in this Circuit in the Buser Case just referred to.

The court cannot agree with this claim. It is compelled upon "a consideration of the evidence in the aggregate" (United Shoe Case, supra, page 898) to answer the inquiry just above propounded in the negative—that is, that the evidence in the instant case is not sufficient to satisfy the court beyond a reasonable doubt that the unpatented devices of the St. Charles Company were complete anticipations of the patent in suit.

In this connection it is to be noted that no drawings or written description of the gliders were produced, except photographs C—1 to C—14, which it is conceded were not made until December, 1932. No St. Charles glider of the spring strap type has been introduced in evidence; the only physical device introduced is a single spring strap broken at its lower end and having a bracket at its upper end. (Exhibit B). The date on which this broken sample was made has not been established. As pointed out by plaintiff, it is reasonable to suppose that it was not made until 1933, because it is 1½ inch in width (Turner Dep. p. 16), and gliders having spring strap hangers 1½ inch in width were placed in the St. Charles Company's regular line in January, 1933. (D. M. Lillibridge, Dep. pp. 42, 44). According to the deposition of W. P. Lillibridge, 1¾ inch straps were used in the St. Charles gliders in 1931. (Dep. p. 24).

The only documentary evidence produced in support of the contention that the St. Charles Company made spring strap gliders before the Fall, 1932, is defendant's Exhibits E and F. Exhibit E purports to be master sheets and printer's proofs for use in printing a catalogue supplement and price lists for the 1932 season, but so far as the record shows, this supplement was never printed. Exhibit F is a typewritten price list taken from a loose leaf folder of the St. Charles Company, and said to have been made in the latter part of 1931. Neither of these documents illustrates any structures. We have only the oral testimony of the witnesses that the class numbers 1098 and 1298, appearing thereon, refer to spring strap gliders.

As heretofore pointed out, Mr. Turner testified that the St. Charles Company used spring straps in widths of 2″, 1¾″ and 1½″, of which the 1½″ size was most suitable, and that they had trouble in the crystallizing and tearing of the metal and

that some of the gliders were returned. Mr. Durstock testified that the 1½" spring strap was the best, and that the samples made for the January, 1931, show had to be changed by replacing the straps during the first two or three weeks of the show.

■ Although it appears to be claimed by defendant that spring strap gliders in considerable numbers were made and sold by the St. Charles Company, not one of such gliders was produced. Mr. Hough was a traveling salesman for that company for twelve years, up until February, 1935, and was unable to give the name of even a single purchaser of spring strap suspension gliders previous to the year 1933. (Dep. p. 12). The lack of all such evidence is a matter for consideration. Markatos v. United Bootblack Supply Co., D.C., 52 F.2d 478, 479; Mueller Mfg. Co. v. Glauber, 7 Cir., 184 F. 609, 618.

Although the St. Charles Company issued catalogues in even numbered years, yet none such was introduced showing a spring strap glider. Exhibit E was never printed. The earliest actual representations of the spring strap gliders made by the St. Charles Company were the photographs Exhibits C—1 to C—14, of December, 1932. These are subsequent to the first showing by plaintiff at the Chicago Furniture Mart, and subsequent to the filing date (October, 1932) of the McGowen patent in suit. The St. Charles Company did not place spring strap gliders in their regular line until 1933 (D. M. Lillibridge, Dep. p. 42), and it is not conclusively shown that even these were practical. While Mr. Shott claims to have seen some of the spring strap gliders at the St. Charles exhibit, in Chicago, in January, 1931, he does not discuss the structural details of the gliders which he saw.

■ It further appears that during the summer of 1934, the St. Charles Company was negotiating with plaintiff herein for a license to manufacture and sell spring strap gliders under the McGowen patent in suit. These negotiations followed a notice from plaintiff's attorney that the St. Charles Company was infringing the McGowen patent here in suit. Defendant claims that due to the financial difficulties in which the St. Charles Company was involved at the time, any testimony regarding negotiations for a license should be of little weight.

While it is no doubt true that there are many instances where a party has preferred to purchase a license, if possible, rather than undergo the annoyance and incur the expense generally incident to actions for infringement, and therefore testimony regarding negotiations for, or even the taking of, a license should not because of those facts alone be given great weight, nevertheless some significance and weight must be given in the instant case to the fact that when (during these negotiations in the summer of 1934) letters were written by W. P. Lillibridge (Exhibit 4) and D. M. Lillibridge (Exhibit 5), President and Secretary, respectively, of the St. Charles Company, no mention was made by either of a spring strap glider having been completed as early as the summer of 1930 by the St. Charles Company, yet both of these are now witnesses relied upon by defendant to prove anticipation. Even if, as pointed out by D. M. Lillibridge in his deposition, the St. Charles Company was not in financial condition to fight an infringement suit in 1934, he could certainly, in the letter Exhibit 5 (August 29, 1934), have called plaintiff's attention to the fact (if it was then claimed to be a fact) that McGowen was not the first inventor, but that the St. Charles Company had anticipated the invention as early as 1930 or 1931.

In this connection it is further to be noted that these letters were written within three years (certainly a comparatively short time) of the time defendant now claims the anticipating devices were made and sold by the St. Charles Company, and that Mr. Lillibridge stated that he was at that time (when the letters were written) in possession of all the information that he had at the time of trial.

Under these circumstances the significant thing is not the fact that the St. Charles Company negotiated with plaintiff for a license and in the course of such negotiations wrote letters, but it is that it did not in those letters or at any point in the negotiations mention any claim (here asserted by a third party, to-wit, defendant herein) that it had made and sold devices which anticipated the devices of the patent in suit. This failure may properly be considered as tending to show the non-existence of the fact. "The general rule is that the failure of a person to assert a fact, when it would have been in the natural, ordinary course for him to assert it, is evidence tending to show the non-existence of the fact." International

Harvester Co. v. Voboril, 8 Cir., 187 F. 973, 974.

Thus the record here presents quite a different situation from one wherein the testimony merely shows negotiations for, or even the granting of, a license, as bearing upon anticipation.

During the taking of the deposition of Duane M. Lillibridge, counsel for defendant objected to certain questions that were asked Mr. Lillibridge (Dep. p. 45) with respect to the reason why there was a failure to reach an agreement between the witness and plaintiff company regarding a license under the McGowen patent in suit. It was claimed by counsel for defendant "that this examination of the witness is clearly beyond the direct examination". The objection was renewed at the time of trial (Rec. p. 167). At that time the court stated (Rec. p. 173) that it would pass upon this objection later when it decided "the final question in the case." The objection is overruled, with exception to defendant. The record shows that the witness was asked certain questions (at first without objection) regarding his negotiations and the letter Exhibit 5. The subsequent cross-examination merely followed these questions. As claimed by plaintiff it would seem that defendant's objection came too late, but even passing this question of timeliness, the cross-examination was proper. On direct examination the witness testified regarding his activities in connection with the development of a spring strap glider and its marketing by the St. Charles Company. It was proper to inquire upon cross-examination as to any conduct or acts that were inconsistent with his testimony on direct examination. Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624; Coca-Cola Co. v. Moore, 8 Cir., 246 F. 942; Commercial State Bank v. Moore, 8 Cir., 227 F. 19. That there were these negotiations was testified to by W. P. Lillibridge (Dep. p. 27) and by the witness Bond (Rec. pp. 64 et seq.) without any objection in either instance.

In their brief counsel for plaintiff state: "We do not question that the St. Charles Net & Hammock Company attempted to make a spring steel suspension glider some time in 1931".

The court is of this same opinion, but it is extremely doubtful from the evidence adduced whether the St. Charles Company at that time got beyond the ex-perimental stage. It was no doubt experimenting with spring steel straps, but the evidence does not show a successful operable structure, nor does it establish a valid public use or prior invention under the applicable law. "The defendant, to anticipate the patents in question, was required to prove beyond a reasonable doubt that the Ashland structure was complete and capable of operating and achieving the identical results of the patents in issue. It has failed to do so. * * * To anticipate, the prior structure must have been identical in substance and effect and in the means by which the functions of plaintiff's inventions were performed. Volume 1, Robinson on Patents, p. 310, § 236." Auditorium Ventilating Corp. v. Greater Rochester Properties, Inc., D.C., 59 F.2d 450, 459.

The net result of all of the evidence in the instant case does not justify a conclusion appreciably different from or stronger than that arrived at in the Logan Case, D.C., 15 F.Supp. 644, 647, on whatever evidence was before the court there, to-wit, "The St. Charles Net & Hammock Company catalogued and sold gliders before the patent in suit was issued, having many features of McGowen's glider."

Plaintiff offered testimony of certain furniture buyers and dealers for the purpose of showing that its spring strap glider, because of its smoother glide as compared to link suspension gliders and because of its otherwise inherent merit, achieved immediate commercial success. The record shows sales for the past three years.

Defendant denies that the proof establishes that the public accepted or approved plaintiff's device to such an extent as to establish commercial success.

While the presumption of novelty and utility is strengthened where the patented article meets marked commercial success, Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 441, 31 S.Ct. 444, 55 L.Ed. 527, and this element is one proper at times to be taken into consideration, Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, nevertheless, in view of its conclusion, otherwise reached, the court has not deemed it necessary to nor has it considered the question of alleged commercial success beyond noting that the proof in this respect, in the instant case, is sufficient to justify the same conclusion here, as was reached in the Logan Case page 647, to-wit,

that McGowen's "appliance, when manufactured and placed on the market, materially increased the marketability and salability of gliders."

The court is of opinion that the McGowen patent is valid. While this is the same conclusion reached by Judge Hamilton in the Logan Case, and while this court has stated that it is content to adopt the reasons upon which Judge Hamilton bases his conclusion in that case, nevertheless this court has arrived at its conclusion by its own independent study and research of the record and the applicable law. While naturally and properly the decision in the Logan Case was treated by this court as persuasive, the court fully understands that that decision is not controlling here and it was so treated.

Does then the device of the defendant infringe?

The four claims of the McGowen patent each specify that the flat strap-like members that serve as the suspending means from the end frames of the glider to the lower end of the seat portion shall be "rigidly connected" at one end to the frame and at the other end to the seat member. The patent in suit shows that this rigid connection is made by two bolts or rivets at the top and bottom of each strap; among other things, this provides an effective method of resistance to endwise movement of the seat.

It is defendant's claim that its devices alleged to infringe do not have the opposite ends of the flat steel hangers rigidly connected, as called for by the claims of the McGowen patent, but instead a single bolt and nut is used for detachably connecting the upper end of each hanger to the frame and a single rivet is used for the lower end of each hanger for attachment thereof to the seat member; that this bolt and rivet attachment means does not effect "rigid connection" as called for by the McGowen patent, and therefore in order to avoid lateral or endwise sway of the seat member between the end frames, defendant employs a stabilizer, the function of which is to check endwise or lateral sway of the seat and to yieldingly resist movement of the seat member from its normal stationary position. It is asserted that by reason of the yielding action of the stabilizer, the stabilizer functions as a means tending to return the seat to its normal position without depending upon the action of gravity for such return movement of the seat.

The proof shows that defendant had manufactured gliders comprising chain and similar suspension means, and that on such gliders it had used these stabilizers as early as 1928. It further shows (Rec. pp. 114–115) that defendant made a swing glider (as shown in Exhibit S), which discloses the top and bottom of each hanger as fastened by two rivets or bolts, but that this glider was dismanteled by defendant upon receipt of notice of infringement from the plaintiff. (Rec. pp. 104–105).

Upon receiving this notice of infringement and after consultation with its attorney, defendant eliminated certain of the bolts (Rec. pp. 105, 106, 107) and commenced to build the alleged infringing structure here in suit with only a rivet connecting the bottom end of the strap to the seat member and a single bolt connecting the upper end thereof to the stationary frame. Defendant claims that as a result of this the strap members are not "rigidly connected"; that because thereof there is a tendency of the seat portion to swing laterally or endwise between the frame members and that to overcome this the defendant employs upon its devices a stabilizer, the function of which is to control and obviate, if possible, this lateral sway of the seat portion between the end frames, and that these stabilizers are the same as the defendant had used upon its various other gliders of the chain and link suspension type since about 1928, or at least since a date prior to 1930. And defendant submits that if either end of the flat strap suspension means be not "rigidly connected" to one or the other of the indicated members, there is no infringement; that the single nut and bolt whereby the upper ends of the strap hangers are attached to the stationary frame do not fall within the language of the claims, and that the single rivet provided at the lower end of each of the strap hangers for attachment thereof to the seat members fails to give that rigid connection as shown in the McGowen patent by the use of a pair of bolts at both the upper and lower end of the flat strap suspension means. Defendant asserts that the reason why the McGowen patent shows two bolts at each end of the flat strap hanger is in order to obviate side or lateral sway of the seat between the frame ends, which defendant seeks to overcome by means of the stabilizer. The stabilizer consists of springs which are connected at their ends to the

swinging seat frame and the stationary end frames.

The testimony shows that defendant's gliders are shipped from its plant in a collapsed or knocked-down state; that they are assembled or set up in operative position by the customer. Defendant concedes that the degree to which a customer would tighten up the bolt and nut attachment means would necessarily vary and would be controlled by the force applied to the nut and bolt, and that it is possible that in some installations the customers may use such pressure as to approximate riveting or "rigid connection".

From court room demonstrations, as well as from a study of the Exhibits, the court is convinced that defendant has not succeeded in avoiding the claims of the McGowen patent by its changed construction. If the bolts on defendant's devices are attached with that fair degree of tightness, which it must be presumed in the natural course a customer would tighten them, the straps become "rigidly connected".

As claimed by plaintiff, what defendant appears to have done is to have removed the element which assists in the avoidance of end-sway, namely, the second bolt in the lower end of the end frames, and thus having increased the tendency to end-sway, it has then added a stabilizer in order to restore the function performed by the second bolt. However, as appeared from the court room demonstrations, defendant was not able to completely nullify the natural function of the spring steel straps in preventing end-sway, even in a glider in which the straps were loosely fastened. Another inherent advantage in the use of spring strap suspension, even though the straps are connected by only a single bolt or rivet, is the elimination to a considerable extent of canting or yawing of the swing seat when unbalanced propelling force is applied thereto, as by a person sitting at one end of the seat. Under unbalanced loads or propelling forces, frequently the ends of the seat will not have uniform swinging movement. The spring straps, by reason of their bolted or riveted connections at the top and bottom, offer substantial resistance to the twisting forces which produce this condition, and obviously this resistance is substantially the same in the spring straps of defendant's glider, even though such straps are bolted or riveted by but a single element at each end.

The spring straps of defendant's glider, even when connected by only a single bolt or rivet at the top and bottom, serve as a means for effecting the four principal advantages of plaintiff's structure: (a) Smoother gliding movement, (b) avoidance of squeaks such as occur in chain and link suspension gliders, (c) resistance to sway end-wise of the seat, (d) resistance to skewing or yawing.

█ It appears to be defendant's claim that the use of a single bolt and rivet at the top and bottom, respectively, of the spring straps produces a difference in structure over the glider of the patent in suit, in that this arrangement permits the swing to have end-wise sway and thus eliminate one of the advantages set forth in plaintiff's patent.

Even if conceded, infringement, if it otherwise exists, is not avoided thereby. Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 76 F.2d 653. As stated in McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375, 384, infringement is determined by what the infringing machines actually do and not in what they omit to do.

█ No impairment of a function is an excuse for appropriation of a prior invention covering the same idea of means. Auditorium Ventilating Corp. v. Greater Rochester Prop., D.C., 59 F.2d 450, 456. And a party who merely substitutes an old ingredient for one of the patented combination is an infringer if the substitute performs the same function as the ingredient for which it is substituted, and it appears that it was well known at the date of the patent that it was adaptable to that use. Imhaeuser v. Buerk, 101 U.S. 647, 656, 25 L.Ed. 945.

█ Stabilizers of the kind used by the defendant have long been well known in the glider art. To utilize two separate devices to perform the function of a single patented structure does not avoid infringement. Simplex Piston Ring Co. v. Hamilton, D.C., 21 F.2d 196, 199. Differences in form and shape do not negative infringement, where the devices do the same in substantially the same way and accomplish substantially the same result. Cleveland Automatic Mach. Co. v. National Acme Co. 6 Cir., 52 F.2d 769. Even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee (which defendant claims to be true with respect to the patent in suit) and cannot be extended to embrace

a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935.

The court is of opinion that whatever changes have been made in defendant's adaptation are merely colorable without any new principle of operation and that its devices do infringe the patent in suit.

Goodman Design Patent No. 91,997.

This patent was also before the Kentucky District Court in the Logan Case. In that case, however, the court reached the conclusion that the glider of the defendant (in the Logan Case) was not an infringement of the Goodman patent, and stated (page 648) that in view of its conclusion "that there is no infringement of the design patent by the defendant, it becomes unnecessary for me to pass on its patentability."

In the instant case the court has concluded that the Goodman patent is invalid. The court has reached its conclusion upon the considerations and for the reasons which follow.

1. Defendant submits that the invalidity of the Goodman patent is established in several ways; that the design is anticipated by the Simmons glider (Exhibit L); by McGowen patent, No. 2,000,859, filed December 29, 1933 (Exhibit M—12), jointly with McGowen Design Patent No. 92,013 (Exhibit M—11); by prior art patents to Sisbower, No. 1,566,044, filed December 22, 1921 (Exhibit M—15); and Mintz Design Patent No. 65,593, filed June 14, 1924 (Exhibit M—13), and various gliders shown in the catalogues A and D, particularly at pages 6, and 23 to 33 of the 1930 catalogue, Exhibit D.

Primarily, however, defendant for anticipation relies on McGowen patent No. 2,000,859; McGowen Design patent No. 92,-013 and the Simmons glider, Exhibit L. All of these devices show arm rests of sheet metal. The application for McGowen patent No. 2,000,859 was filed December 29, 1933. The Goodman design application was not filed until February 14, 1934, about two and one-half months later. The McGowen Design patent No. 92,013 was filed on the same date as the Goodman Design Patent, to-wit, February 14, 1934.

It is agreed by plaintiff (Br. p. 47) that the McGowen Design Patent No. 92,013 corresponds "closely to the showing of the McGowen patent No. 2,000,859."

2. Assuming (for the immediate purpose) that the Goodman patent is not anticipated by McGowen patent No. 2,000,859 and McGowen Design Patent No. 92,013, the question arises, what is there in the Goodman patent that is not old in the art, because the questions of novelty and infringement are dependent upon the "state of the art" in design cases as well as in mechanical cases, and consequently the state of the art and the room left for invention when the application is filed must be considered.

Gliders generally are quite old. The stationary frame, the swinging seat, the cushions and other upholstery are all old. The only things that distinguish the Goodman patent from prior art devices are the specific end frames and the four inverted J shape bars or strips that lie upon the arm rests. The flat strap suspension means are disclosed in the McGowen patent in suit, No. 1,959,032, and in the 1932 photographs, Exhibits C—1 to C—14. The half round arm rests are old in the Simmons glider, and in pieces of furniture such as is shown in Lane Design Patent No. 90,917. Arm rests of different degrees of curvature are shown in the old catalogues of the St. Charles Company and in Exhibit 7. The depending flat fabric straps A and arm rest of end support E of Sisbower Patent No. 1,566,044, anticipate any novelty presented by reason of the provision of fairly wide flat suspension members and an arm rest disposed above the straps. There is little difference between the end frames shown in the various gliders, Simmons device, Exhibit L; Atkinson patent No. 1,650,178 (Exhibit M—1); Ericson patent No. 1,953,752 (Exhibit M—7), and Mintz Design patent No. 65,593 (Exhibit M—13). These differences are merely the changes that are naturally expected from conventional designers and do not amount to invention.

In view of the state of the art, it is extremely doubtful if there is any patentable novelty shown in the Goodman Design patent.

3. Is Goodman anticipated by McGowen? It is true that in the Goodman patent the flat strap hangers, curved arm rests and inverted J bars (decorative metal strips) over the curved arm rests are all associated. For this patentable novelty is

claimed. All these details, however, are found in McGowen patent No. 2,000,859 (Exhibit M—12), the application for which antedates the Goodman application by more than two months. The fact that the McGowen patent application was filed prior to the Goodman application establishes prima facie, at least, that McGowen invented the design. This prima facie case is strengthened in the present instance by the further fact that on February 14, 1934 (the same date as Goodman), McGowen filed his application for his Design patent No. 92,013, which also shows many of the features of the Goodman patent, including the inverted J bars or strips over the curved arm rests.

Under these circumstances, defendant having shown with certainty anticipation by the McGowen patent, it becomes necessary for plaintiff, in rebuttal, to show, if not with equal certainty, yet to the satisfaction of the court, that Goodman invented his design prior to the date of such anticipation. Twentieth Century Mach. Co. v. Loew Mfg. Co., 6 Cir., 243 F. 373, 381, 382. Otherwise, Goodman could not be considered the first inventor and the Goodman patent is invalid. Milburn v. Davis Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

4. Plaintiff seems to recognize this rule and in keeping with it, introduced evidence in an effort to show that Goodman designed his structure previous to the invention of the McGowen patents. In this connection plaintiff offered the testimony of Messrs. Bond, McGowen and Westlake. Plaintiff also produced a drawing, Exhibit 16, which it claims was made by Goodman. Mr. Goodman himself did not testify. The proof, however, in this connection is not such as to satisfy the court that Goodman designed his structure previous to the McGowen patents. Mr. Bond says that he saw Goodman working on Exhibit 16 in the early part of April, 1933 (Rec. p. 58), but that it was not more than two-thirds completed at that time (Rec. pp. 69–70). He was unable to state what parts he saw Mr.

Goodman add to Exhibit 16 (Rec. p. 70). Mr. Westlake did not know of the origin of Exhibit 16, except by hearsay. (Rec. p. 52). Mr. McGowen did not see Goodman make the drawing, Exhibit 16 (Rec. p. 36), but says that it came into his possession in April, 1933. (Rec. p. 26). Mr. McGowen further testified that gliders conforming exactly with the disclosure in McGowen patent, No. 2,000,859, were made for commercial purposes, in May 1933, and that the entry No. 127 (made August, 1932) in Exhibit 12—B relates to both the design patent No. 92,013 and the mechanical patent No. 2,000,859 (Rec. p. 35). It was further testified to by Mr. Bond that while the end straps are functional (Rec. p. 68), the two added inverted J straps are merely decorative. Their use at all is optional. (Rec. p. 28). The record shows (pp. 57 and 69) that Mr. Goodman as an individual had had himself incorporated, and that as such he was associated with a firm of designers and decorators, and that he collaborated with the plaintiff company in making designs for articles of furniture, some of which were displayed in the Florida House at the Century of Progress Exposition. The drawing, Exhibit 16, does not bear the signature of Percival Goodman, the patentee of Design Patent No. 91,997. There is printed on the drawing, however, the name "Percival Goodman, Inc.", with the date April 20, 1933.

5. Upon full consideration, the court is of the opinion that the proof offered by plaintiff to show that Goodman designed his structure previous to the invention of the McGowen patents is inadequate and of such a character as not to establish plaintiff's claim to the satisfaction of the court. The court finds, therefore, that the Goodman Design Patent, if not otherwise invalid beause of the lack of patentable novelty due to the "state of the art", at least is invalid because of anticipation thereof by McGowen Patent No. 2,000,859. This view is strengthened by a consideration, in conjunction therewith, of the McGowen Design Patent No. 92,013.