The CONNECTICUT ADAMANT PLASTER COMPANY, Libelant,

v.

JAMES McWILLIAMS BLUE LINE, Inc., Respondent,

and

National Gypsum Company, Respondent-Impleaded,

and

Charlotte F. Jacobus and F. Jacobus Transportation Company, Inc., Respondents-Impleaded.

Charlotte F. JACOBUS, as owner and as charterer in possession of The Scow LOUISE, Libelant,

v.

JAMES McWILLIAMS BLUE LINE, Inc., Respondent,

and

National Gypsum Company, Respondent-Impleaded.

United States District Court
S. D. New York.
Feb. 5, 1957.

Bigham, Englar, Jones & Houston, New York City, Proctors for Connecticut Adamant Plaster Co., Donald M. Waesche, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, Proctors for James McWilliams Blue Line, Inc., Leo F. Hanan, New York City, of counsel.

Foley & Martin, New York City, Proctors for Charlotte F. Jacobus, as owner, and F. Jacobus Transp. Co., Inc., Christopher E. Heckman, New York City, of counsel.

Matthew E. Lawless, New York City, Proctor for National Gypsum Co. by Purdy, Lamb & Catoggio, New York City, Edmund F. Lamb, New York City, of counsel.

DAWSON, District Judge.

These are two actions in admiralty, which were consolidated for trial, in which recovery is sought for the loss of a cargo of gypsum rock laden on the Scow "Louise" which was lost overboard when that scow careened in Bridgeport Harbor, Connecticut, on August 16, 1953, and in which recovery is sought for the damages to the scow.

Connecticut Adamant Plaster Company (hereinafter referred to as "The Plaster Company") was the owner of the cargo of gypsum rock.

Charlotte F. Jacobus and F. Jacobus Transportation Company, Inc., were respectively owner and operator of the Scow "Louise".

James McWilliams Blue Line, Inc. (hereinafter referred to as "The Blue Line") was the charterer from Jacobus of the Scow "Louise" and the carrier of The Plaster Company's cargo.

The National Gypsum Company was the shipper of the cargo of gypsum rock and loaded the cargo aboard the Scow "Louise".

### Facts

The following facts are found by the Court:

1. The "Louise" was a deck scow, approximately 114 feet in length, 34 feet in width and 10 feet in depth. It drew 23 inches, when light. The cargo was carried on the deck. It was equipped with two hand pumps. The scow was built in 1928, but extensive repairs had been made on it in 1951 and in 1952. After the repairs were completed, the scow remained in operation.

2. In February, 1953, the scow was chartered to Colonial Sand & Stone Company, which used it to carry cargoes of sand and gravel from Hempstead to New York Harbor. This company used it continuously until July, 1953, at which time it was laid up light at Pier 6 on the East River.

3. The "Louise" was owned by Charlotte F. Jacobus but was chartered by bare boat charter to the F. Jacobus Transportation Company, Inc.

4. On August 14, 1953, the Scow "Louise", together with the Scow "South", was chartered to The Blue Line. This company towed the scows from Pier 6 on Saturday, August 15, and took them to the plant of the National Gypsum Company at Oak Point in the Bronx. There the scows were loaded by National

Gypsum Company with gypsum rock destined for The Plaster Company at New Haven, Connecticut.

5. During the process of loading the scows at the plant of National Gypsum Company, the Scow "Louise" was leaking. The captain of the scow was concerned about the leaking and the loading, and telephoned the Marine Superintendent of Jacobus at his home in Flushing. The latter went by car to Oak Point, bringing with him an emergency gasoline pump which was put on the scow and started up in operation. At that time, there was about an inch and a half of water in the hold of the "Louise" on the starboard side. The scow had not been loaded evenly so that it was down by the starboard bow. The Marine Superintendent of Jacobus arranged with employees of National Gypsum Company to trim the load, which they did, in the course of which some of the material was shoveled overboard. When the trimming was completed, the Marine Superintendent concluded that the scow was seaworthy and able to start on its voyage.

6. The scow was put in a tow to be hauled to New Haven by the tug "Dewey" owned by The Blue Line. The tow left Oak Point about 6:00 p. m. The weather was clear; the wind slight.

7. The scow continued to take on water even though the captain of the scow had the emergency gasoline pump operating for a while. Between 3:00 and 3:30 a.m. of the following morning, the scow began listing considerably to starboard and the master of the tug got a signal from the scow, indicating that the scow wished to come alongside. The scow was pulled up to the tug. It developed that the gasoline driven pump on the scow was out of order and that the scow was taking on a great deal of water. An attempt to fix the pump resulted in a broken sparkplug, which made it impossible to put the pump back in operation again. The engineer of the tug, who went on board the scow at this time, heard water entering the scow from the starboard bow corner. He testified that this leakage was not a drip but was of such magnitude that he could hear the water running down the corner of the boat. At that time, the deck of the scow at the bow was even with the water level. The scow was then approximately outside the Harbor of Norwalk. The crew of the tug then put their gasoline driven pump on the scow and started it in operation. After this the voyage continued.

8. By ten o'clock in the morning, the scow had taken on a great deal of water. At that time, the tug again pulled the scow up to it. The engineer of the tug went on the scow and found out that the tug's pump which had been placed on the scow had become inoperative due to a broken gasket. The captain of the scow testified that the scow was taking on a great deal of water and that he was "scared". The captain of the tug then proceeded to tow the Scows "Louise" and "South" into Bridgeport Harbor and to leave the other two scows, which were in the tow, anchored in Long Island Sound. The scow "South" was placed alongside a dock in Bridgeport Harbor and the tug then pushed the "Louise" on to a mud flat. The tug then proceeded to the municipal dock in Bridgeport to get spare parts to repair the pumps. After a short interval, it returned to where the "Louise" had been beached on the mud flat but, shortly before it arrived, the "Louise" careened, dumped most of its cargo overboard, and then righted itself.

### The Issues

Since the cargo owned by The Plaster Company was lost, the questions presented by the libel of this party are whether the loss was occasioned by (1) the unseaworthy condition of the scow; (2) improper loading of the scow; (3) improper towing or care by the tug; or (4) a combination of any of the foregoing.

Since the scow owned by Charlotte F. Jacobus was damaged by the events, the questions presented by the libel of the owner and the charterer in possession are whether the damages were occasioned by

(1) the unseaworthy condition of the scow; (2) improper loading of the scow; (3) improper towing or care by the tug; or (4) a combination of any of the foregoing.

### Discussion

#### 1. Condition of the Scow.

There can be no doubt from the testimony that the scow was taking on water from the time that it commenced loading. When the Marine Superintendent from Jacobus arrived at Oak Point, he found that water was in the scow which could not be emptied by the hand pumps, and he put an emergency gasoline driven pump on the scow and started it in operation. After this pump had been operated for some time and the loading was completed, he felt that the scow then was in a seaworthy condition and fit to proceed on her journey. Nevertheless, within a short time thereafter, the emergency pump broke down and so much water was entering the scow that the captain of the scow had to summon aid from the tug and have the speed pump from the tug put on the scow. At this time, water was entering the tug at such a rate that the stream was audible to a man standing on the deck of the scow. When the pump of the tug also broke down, the scow continued to ship a great deal of water so that it appeared that the scow might sink. This was its condition when it was towed into Bridgeport Harbor and pushed on the mud flat. It is not quite clear what happened thereafter to cause it to careen, but the inference is clear that, with a lot of water in the hold and over 800 tons of gypsum rock on the deck, the scow was topheavy and, as it slid off the mud flat, it lost its equilibrium.

There was some evidence presented by the respondents Jacobus that, about two weeks thereafter, the scow was inspected by marine surveyors and found to be water-tight and, at that later time, when it was laden with a heavy load of stone, it did not take on any appreciable amount of water. However, the Court is far from convinced that some repairs were not made to the scow between the time of its careening and the time of its later inspection by the surveyors.

Mr. Hansen, one of the surveyors who had examined the scow in Bridgeport on August 18, testified that, on the starboard side at the filler plank, there was at that time a decayed area and that he could observe daylight through a hole that was 14 inches below the deck. He said that the hole was a small hole but that the decay extended over several bays, each of which was 8 feet wide. Mr. Hansen was one of the surveyors who examined the scow again on September 2 at a yard in Long Island, to which it had been taken. He indicated that the hole in the filler plank had been filled up and he could no longer see daylight through it.

Mr. Watson, a marine surveyor who also inspected the scow on September 2, said there were indications that the scow had been leaking and that the leaks had been stopped by filling.

The only possible explanation for the fact that there were leaks in the scow on the day it careened and that these leaks were not apparent when the scow was inspected a couple of weeks later was that the holes had been caulked in the interval.

■ Jacobus, as owner of the scow, warranted the seaworthiness of the scow at the time it was chartered to The Blue Line and the burden of proving she was seaworthy at that time rests on the owner. The Cullen No. 32, 2 Cir., 1932, 62 F.2d 68, affirmed Cullen Fuel Co. v. W. E. Hedger, Inc., 1933, 290 U.S. 82, 54 S. Ct. 10, 78 L.Ed. 189; The Irving, D.C. S.D.N.Y.1936, 16 F.Supp. 22.

■■ The Court finds as a fact that the scow was not seaworthy when delivered to The Blue Line and that this unseaworthiness was a proximate cause of the later careening of the scow and the loss of the cargo therefrom, and the damages resulting to the scow from the careening. Since Charlotte F. Jacobus and F. Jacobus Transportation Company, Inc. delivered to The Blue Line a scow which was not seaworthy and the damages which she suffered while in posses-

sion of The Blue Line were proximately caused by her unseaworthy condition, so much of the libel of Charlotte F. Jacobus and F. Jacobus Transportation Company, Inc. as seeks damages against The Blue Line is dismissed.

■ The cargo of gypsum rock was entrusted by The Plaster Company to The Blue Line and was lost while in transit. The answer of The Blue Line admitted that the "Louise" was not in a seaworthy condition and that "said unseaworthy condition caused or contributed to the damage referred to in the libel." The Blue Line asserts, however, that the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315, is the measure of its obligation to the cargo owner. Under this statute the carrier was under an obligation to exercise "due diligence" to make the scow seaworthy. 46 U.S.C. A. § 1303(1) (a). Failure of The Blue Line to inspect the "Louise" and determine her fitness constitutes a failure to discharge its obligation of due diligence. Petition of Reliance Marine Transp. & Const. Corp., 2 Cir., 1953, 206 F.2d 240.

■ The Court concludes that The Plaster Company is entitled to a decree for the amount of its damages against The Blue Line and that the latter is entitled to a decree over against Charlotte F. Jacobus and F. Jacobus Transportation Company, Inc.

2. The Loading of the Scow by National Gypsum Company.

This leaves for consideration the question of liability, if any, of the National Gypsum Company. The Blue Line impleaded the National Gypsum Company on the ground that the National Gypsum Company improperly loaded the "Louise" and that the improper loading caused or contributed to the damage to the scow and the loss of the cargo.

In a letter sent by the proctors for Jacobus to National Gypsum Company, dated October 30, 1953, they made claim for damage to the "Louise" resulting from an "overturning," stating that "the damage resulted from the improper loading of the cargo."

At the trial, Jacobus contended that the loading resulted in the twist in the scow with the result that the owner had to dispose of the scow; and Jacobus also contended that such twist was a proximate cause of the later careening of the scow.

■ A twist exists when all four corners of a scow are not in one horizontal plane; in this condition the two corners diagonally opposite each other are higher or lower than the other corners. A twist is therefore a distortion of the frame of the scow occasioned by excessive strain. A twist may be the result of maldistribution of the load, grounding on an uneven bottom or careening. The testimony was that a twist would not result in a scow from overloading unless there was a massive maldistribution of the load.

There was evidence that when the scow was surveyed on September 2, 1953, some two weeks after the careening, she was found to have a twist and that the caulking was found "started in various places throughout the hull." However, this condition could have been caused by the careening and was not necessarily caused by the loading.

The primary evidence that improper loading had caused this condition was the testimony of Bard, the Marine Superintendent of Jacobus, who stated that when he arrived at the plant of the National Gypsum Company where the loading was in progress, the scow was listing considerably to starboard and was twisted. That the scow was listing to starboard at that time seems to be undisputed. Mr. Bard arranged, however, for the employees of National Gypsum Company to trim the load so as to even out the load on the scow and when this was finished he advised that the scow was loaded to his satisfaction and that he was satisfied with her condition. Later he told one of the surveyors that at the time the scow was towed away from Oak Point it was in "perfect" condition.

If the scow had been in a twisted condition at Oak Point as a result of the loading, it is reasonable to suppose

that Bard, a supervisory official of the scow owner, would have called attention to this condition of the scow at the time of the loading and would have made claim for the damage, particularly since elimination of a twist would require costly repairs to the scow. That Bard did not make such claim at that time gives rise to an inference that the "Louise" did not sustain a twist as a result of the loading. "The general rule is that failure of a person to assert a fact, when it would have been in the natural, ordinary course for him to assert it, is evidence tending to show the non-existence of the fact." International Harvester Co. v. Voboril, 8 Cir., 1911, 187 F. 973, 974. Furthermore, in the later letter sent by Jacobus to National Gypsum on October 30, 1953, they made no claim for a twist but only for damages resulting from the overturning. Failure at that time to assert that a twist had occurred even before the overturning is evidence which tends to show that the twist resulted from the overturning rather than the overloading itself. McKay Co. v. Shott Mfg. Co., D.C.W.D.Ohio, 1937, 25 F. Supp. 716, 722.

█ The evidence leads the Court to the conclusion that the careening was the result of leaking of the scow. There was no competent evidence that the leaking was caused by improper or negligent loading. The damages occasioned to the scow and its cargo were not proximately caused by improper loading or improper towing but by the unseaworthy condition of the scow.

The captain of the scow, a rather excitable individual who spoke in broken English, testified that there had been no leak in the scow during the time of the voyage but that the water accumulated in the scow because the bow was so low that the water came over the bow. There was no testimony from any of the other scow captains or any of the crew of the tug or anybody else that the scow was shipping water over the bow, and the testimony of the other witnesses was that the water was entering the scow because of leaks. In view of the testimony of the other witnesses that the scow was leaking and the absence of any testimony from other witnesses as to the "Louise" shipping water over the bow, I find the testimony of Mr. Barros, the captain of the scow, on this point, as unworthy of belief.

## Conclusion

The Court concludes:

1. That the scow "Louise" was in an unseaworthy condition when it was delivered to respondent Blue Line.

2. That the unseaworthy condition of the scow "Louise" was the proximate cause of her taking on a large amount of water, becoming top-heavy and subsequently careening and losing her cargo.

3. That the damages to the scow "Louise" and to her cargo proximately resulted from the careening and not from the loading by respondent National Gypsum Company or from any act or omission of respondent Blue Line.

4. That a decree should be entered in favor of The Plaster Company against the defendant Charlotte F. Jacobus and F. Jacobus Transportation Co., Inc., and against respondent Blue Line secondarily.

5. That the libel of Charlotte F. Jacobus against The Blue Line and against National Gypsum Company should be dismissed.

This opinion shall constitute the findings of fact and conclusions of law of the Court. In the event that the parties cannot agree upon the amount of damages, the determination of the amount of damages shall be made by a Commissioner appointed by the Court.

Submit decree within fifteen days from the date of this opinion.